DOE, *ex dem.* RAWSON CAIN and JAMES MORRIS, plaintiffs in error, *vs.* ROE, *cas. ejector,* and GEORGE W. C. MONROE, tenant in possession, defendant in error.

Statute 32 Henry VIII, chap. 9, not of force in Georgia.

Ejectment, in Lee Superior Court. Tried before Judge ALLEN, March Term, 1857.

John Doe, upon the several demises of Rawson Cain and James M. Morris, brought his action of ejectment against Richard Roe, *cas. ejector,* and George W. C. Monroe, tenant

Cain and Morris vs. Monroe.

in possession, to recover lot of land No. 14 in the second district of Lee county.

*Brief of evidence.*—Plaintiff introduced 1st, a copy grant from the State to Rawson Cain for the premises in dispute, dated 23d June, 1843.

2d. A deed from Cain to James A. Morris, the real plaintiff, for the premises in dispute, dated 3d September, 1853, recorded 6th October, 1853, the same being a clear warranty deed.

3d. *Green B. Mayo,* a witness, who testified that the defendant, Monroe, was in possession at the time suit was brought, and had been in possession about twelve or eighteen months. Plaintiff here closed.

*Defendant testimony.*—1st. A warranty deed from David A. Vason to defendant, for one-half of the lot in dispute, dated 25th November, 1850, recorded 7th January, 1851.

2d. A quit claim deed from William J. Parker to defendant, for the other half of the lot in controversy, dated 27th November, 1850, and recorded 7th January, 1851.

3d. A deed from Rawson Cain to defendant, for the same lot, dated 25th January, 1854, and recorded 3d February, 1854.

4th. *Edward B. Floyd,* a witness, who proved that defendant went into possession of the land in the latter part of 1850, in November or December of that year, and has occupied and cultivated it ever since; has cleared about one hundred and fifty acres of it. That the rent of the land was worth about two dollars per acre, and the clearing was worth the rent for two years. Defendant closed.

The jury found for the defendant, and plaintiff's counsel moved for new trial on the following grounds:

1st. Because the Court refused to charge the jury as requested, that the statute of 32 Henry VIII is not in force in Georgia.

2d. Because the Court refused to charge the jury as requested, that if the jury believe from the evidence that the

defendant bought from Cain, he is estopped from setting up the adverse holding as against his vendor, or from making void a deed of anterior date, by reason of his possession.

3d. Because the Court refused to charge as requested, "that there can be no adverse holding of the land as against the vendor."

4th. Because the Court refused to charge without qualification, as requested by plaintiff's counsel, "that if the defendant has failed to prove adverse possession with a *bona fide* claim of right, then the deed to Morris is not void, and the plaintiff is entitled to recover."

5th. Because the Court refused to charge as requested, "that the deeds from Vason and Parker are mere color of right, and no evidence of adverse possession."

6th. Because the Court refused to charge as requested, that if the jury believed that Monroe received a deed for the lot from Cain, in January, 1854, this was a *recognition* of his title, and estops Monroe from denying it; and if they believe that Cain had before that time, to-wit, in September, 1853, conveyed the land by deed to plaintiff, then plaintiff is entitled to recover.

7th. Because the Court charged the jury, that if defendant was in possession of the land under a deed, that made his possession adverse.

8th. Because the Court erred in charging the jury, that they might find the defendant was holding adversely from his cultivating the land, clearing it, putting up fences, and from any other circumstances of that kind in proof, if defendant was in actual possession under title and claim of right.

9th. Because the Court erred in charging, that notwithstanding Cain may have made a deed to plaintiff, in September, 1853, and defendant knew that fact, yet if defendant was in possession at that time under a deed, the deed to plaintiff was void, and defendant might, after the suit was brought, buy the lot from Cain, and receive a deed from him, and if he did so, they must find for defendant.

10th. Because the verdict is against law and the evidence.

11th. Because the verdict is strongly and decidedly against the weight of evidence.

The Court overruled the motion for a new trial on the grounds therein stated, and plaintiff by his counsel excepts.

HAWKINS & McCAY, LANIER & ANDERSON, for plaintiff in error.

VASON & DAVIS, for defendant in error.

The Court not being unanimous, the Judges delivered their opinions *seriatim.*

*By the Court.*—McDONALD J., delivering the opinion.

This was an ejectment brought in the Superior Court of Lee county, in favor of Doe, on the several demises of Rawson Cain and James M. Morris, *vs.* Roe, casual ejector, and George W. C. Monroe, tenant in possession. On the trial, the plaintiff, in support of his case, introduced a copy grant from the State of Georgia to Rawson Cain for the premises sued for, dated 23d June, 1843, and a deed from Rawson Cain to James M. Morris, one of the lessors of the plaintiff, for the same land, dated 3d September, 1853, and recorded 6th October, 1853. It was a warranty deed. The plaintiff then proved that the defendant was in possession at the time the suit was brought and the writ served, and had, at that time, been in possession about twelve or eighteen months.

The plaintiff here closed.

The defendant then introduced in evidence a warranty deed from David A. Vason to the defendant, for one-half of the land sued for, bearing date 25th November, 1850, and recorded January 7th, 1851; also a quit claim deed from William J. Parker, for the other half of the premises in dispute, dated 27th November, 1850, and recorded 7th January, 1851. He then introduced a deed from Rawson Cain, for the entire premises sued for, bearing date 25th January, 1854, and re-

corded 3d February, 1854. The defendant then proved that he entered into the possession of the lot of land sued for, in November or December of the year 1850, and has occupied and cultivated it ever since, and has cleared about one hundred and fifty acres. The land was worth for rent about two dollars per acre, and the clearing was worth the rent for two years.

The jury found a verdict for the defendant. Whereupon the plaintiff's counsel moved for a new trial on eleven grounds, and amongst them, that the Court refused to charge the Jury, as requested by plaintiff's counsel in writing, that the statute of 32 Henry VIII is not of force in Georgia, was one.

The Court refused the new trial, overruling all the grounds taken therein, and the plaintiff's counsel excepted. As this Court reverse the decision of the presiding Judge in the Court below, on the ground that he committed error in refusing to give the above charge as requested, it will be unnecessary to advert to other grounds taken in the motion on which error is assigned.

The only question then, is, whether the statute of 32 Henry VIII, chap. 9, commonly called "the Bill of Bracery and buying of titles," enacted before the British government had a foothold on this continent, is of force in Georgia.

It is insisted by the counsel for defendant in error, that it having been adjudicated by this Court that the statute is of force here, it is no longer an open question, and cannot now be considered. I know of no rule which precludes an appellate Court from reviewing its own decisions, and overruling them. It is a duty of such Court, of the highest obligation, if, by its decision, it has established as law, that which, it becomes satisfied, is not law, to annul its error, and to restore the stream of justice to its ancient and legitimate channel. There is no question of its power to do it, and there is as little question of the morality and justice which require it.

A supreme corrective judicial tribunal is valuable only when it gives uniformity to *law*. This cannot be unless its decisions be based on correct legal principles. I must not be understood, however, as attempting to shake the doctrine of *stare decisis*. For it is essential to the safety of every community that the law should be settled and understood; and when a decision is once *deliberately* made, it ought not to be disturbed but for the most cogent reasons, and upon a clear manifestation of error. 1 *Kent's Comm.* 476. Chancellor Kent remarks, in the page following that quoted above, that he is not to be "understood as pressing too strongly the *stare decisis*, when he recollects that there are one thousand cases to be pointed out in the English and American books of reports, which have been overruled, doubted, or limited in their application." It is probable," he says, " that the records of many of the Courts in this country are replete with hasty and crude decisions; and such cases ought to be examined without fear, and revised without reluctance, rather than to have the character of our law impaired, and the beauty and harmony of the system destroyed by the perpetuity of error."

I will now refer to some of the decisions claimed to have been made by this Court in reference to the statute of Henry VIII.

The first case is that of Pitts *vs.* Bullard, 3 *Kelly*, 17, in which the Court remarks that it is perhaps unnecessary to express any opinion as to the validity of the deed from McWhorter to Bullard, which was the deed claimed to be void under that statute, it being admitted that Pitts was in adverse possession at the time of its execution. It was stated by the Court that the statute of Henry VIII was embraced in the digest of English statutes of force in the State of Georgia, and was in affirmance of the common law. The Court only stated the principle, and did not undertake to discuss it; and said hypothetically, *if this be the law still*, then the deed to

Bullard transferred no right to him, as Pitts was, at the time in possession under sheriff's titles, claiming the land as his own. The circumstances of this case show that this point was not very deliberately considered, nor was it necessary, as it was decided on other grounds. From the case as stated, there was manifestly no adverse possession of the land at the time of the *sale* made by McWhorter to Sims. He sold the land certainly as early as 1835, and gave his bond to Sims to make the title; for Sims, in 1835, transferred the bond to Bullard. Pitts did not enter into possession until December, 1837.

McWhorter, in compliance with his bond, executed a deed to Bullard, to whom it had been transferred, on the 18th of January, 1838. It was certainly not champerty or maintenance to execute a deed, when there was an adverse possession, in completion of a sale of the land, made when there was no such possession. In the case of *Raymond vs. Jackson*, cited in *Jackson vs. Bull*, 2 *Caines case* 301, it was decided "that whenever it is intended to be shown that nothing passed by a grant, by reason that at the time, there was a possession in another, adverse to the grantor then the time to which the grant is to relate, is the time when the bargain for the sale was finally concluded between the parties; and that, consequently, any intermediate adverse possession, before the execution of the conveyance, (which is only the technical consummation or evidence of the grant) can never affect it." Hence, I infer, that this point in the case was not considered with such deliberation as to preclude its re-examination by this Court, *West vs. Holt*, 20 *Ga. Rep* 70. This Court has made the same decision.

In the case of *Harris vs. Cannon* 6 *Ga. Rep.* 388, the Court make the remark, that a deed made by a person of full age, for the purpose of avoiding a deed made by him when an infant, being void as against the act forbidding the sale of pretended titles, could not have that effect until some act of disaffirmance by the infant. This is the substance of it.

The point now before us does not seem to have been made. The deed executed by the party when of age, in avoidance of his deed made when an infant, was not before the Jury. It was offered in evidence and rejected because its execution was not proven. The incidental remark of the Court as to the statute forbidding the sale of a pretended title, cannot be considered as an adjudication of the point, much less, can it be regarded as so solemn a judgment that it is not open to re-examination.

In *Harrison vs. Adcock* 8 *Ga. Rep.* 68, the point was directly before the Court, and without discussing it at all, was summarily disposed of by referring to the case of *Harris vs. Cannon,* just referred to, and of course cannot be considered as of higher authority than that case. In *Thompson vs Richards,* 19 *Ga. Rep.* 594, my brother Lumpkin, delivering the opinion of the Court, said "it was straining pretty hard, perhaps, to adopt the 32 *Henry,* VIII, in a new country like this has been" and in *Millsaps vs. Johnson* 22 *Ga. Rep.* 105, he remarked that "it is exceedingly questionable whether any portion of this act, ought ever to have been adopted by our Courts, for the simple reason, that *the policy in which this statute originated does not and never did exist here.*" Such are the decisions of this Court in regard to the Statutes of Henry the VIII, which we are called on to consider as barring further enquiry into it. A majority of this Court think that these decisions ought to be reviewed, and overruled as far as they recognize that statute as of force here, and the law finally and definitely settled by a solemn enquiry into and adjudication of the matter. We will proceed to that task.

It does not follow, that, because the statute of 32 Henry VIII, chapter 9, to prevent the buying and selling pretended rights or titles, is to be found in Schley's digest, it is of force here. We can scarcely be said to have the assertion of the able and distinguished compiler, that it is of force in this State—and this Court ought to be well assured that it is of force, before it so pronounces it. If it be of force here, it is simply by vir-

tue of our statute adopting certain of the statutes and common laws of England.

That statute adopted such of the statute and common laws of England, *as were usually in force* in the Province on the 14th May, 1776, so far as they are not contrary to the Constitution and form of Government established in this State, *Cobb* 721.

It is not extraordinary that in the absence of reports of judicial decisions of that time, the learned compiler encountered difficulty in ascertaining what English statutes, and what portions of the common law of England were of force in the province on the 14th of May, 1776. He alludes to his embarrassment, and informs us that he was relieved from it, by the suggestion of a learned friend, "that the colonists of America brought with them from England, as their birth-right, all the laws of the the mother country, which were capable of being so transferred, up to the period of the settlement of Georgia, therefore all the English statutes of a general nature must be considered to have been in force anterior to the revolution." The compiler had already quoted from Blackstone, what I consider a more reliable rule, viz: that the colonists brought with them so much and such parts of the laws of England as were applicable to their new situation; such, for instance, as the general rules of inheritance. It is manifest from the terms of our act of revival, that it was by no means considered that *all* the statutes of England, of a general nature, were of force in Georgia, prior to the 14th of May 1776. Such of them as were *usually* in force before that time, were adopted, and none other, and *they* must not have been contrary to the Constitution, laws and form of Government established in this State. To give them force and effect here they must have been recognized and acted upon. The condition of things and circumstances of the people, must have called for their application prior to that time—and they must have been usually in force. "The growth of the colony and the improvement of society" must have actually called

Cain and Morris vs. Monroe.

them into use. If it be said, that the perplexities which so embarrassed the able compiler of the English statutes of force here, as to prevent him, with his clear head and discriminating judgment, from arriving at positive certainty as to all the English statutes of force at the period, fixed in the law, must be encountered by any mind which undertakes the same retro-spection into the laws, for the purpose of ascertaining whether a particular English statute be of force, I can only reply, that it is true, and if they are so great as to prevent the mind from reaching a reliable conclusion, it ought to be considered that the statute is inoperative. If there be doubt on the subject, the judiciary has no power to remove it. It requires the more potent authority of the Legislature to do that. The judiciary must content itself with enquiring whether the particular statute, relied upon as affecting the rights of one of the parties before it, *was usually of force* in the province of Georgia on the 14th of May, 1776. If the practice of the Courts, the usages of the country, the dealings of men, the construction of contracts and the rules regulating the rights of property, have been uniform and in conformity with one of these ancient statutes, from the revolution to the present day, the conclusion is irresistible that the statute is in force. If there be no such conformity of conduct to the provisions of a statute ; if its authority and validity here have been generally disputed and contested, and its effective operation cannot be traced to the legal period that would give it force and effect, it is a safe rule to say that it cannot be regarded as law. If the exigencies of society demand such a statute, the Legislature can enact it. There can be no question, I apprehend, that certain of the English statutes of a general nature were of force in Georgia, while certain others were not, prior to the revolution, and that it was so settled by judicial decisions. In 1778, the Legislature passed an act declaring, among other things, that "all the laws of England, as well statute as common, and *heretofore used and adopted in the Courts of law of the then province*, now State of Georgia,

and which were used and of force at the time of the revolu-
tion" were declared to be of force, except an act specially
mentioned. This was a temporary act, but I refer to it sim-
ply to show that it continued in force the statute and com-
mon law in England so far as they had been judicially de-
clared to be applicable to the circumstances of the people and
no further, *Watkins' Dig.* 231, 232.

It was said in the argument that, because the compiler was
appointed by the Legislature, and his work was reported upon,
under its authority, by distinguished lawyers, the statutes
found in the digest and sanctioned by the committee, are
therefore binding on the people and the Courts, and their va-
lidity cannot now be questioned. This would be to give
them the force and effect of re-enacted statutes, which could
not have been the intention of the Legislature. The object
unquestionably was to collect and embody in a single volume
for convenient reference, those statutes of England which were
supposed by an eminent jurist to have been adopted in this
State. The Courts and the people are no more bound by
them than they are by the digests of our own statutes, made
by gentlemen of great legal ability, under the direct authority
of the Legislature, or promulgated with the countenance of
its subsequent approval. Laws found in such digests, are
*prima facie* of force, nothing more. If at the time of the
compilation of such a digest, some of the statutes embraced
in it, are considered by the Courts as repealed, or superseded
or otherwise inoperative, they must be declared so. The
Court must examine and judge for itself, and consider the
judgment of no compiler however pure and distinguished he
may be, as having the power and authority of a statute.

The provincial Courts, as I have shown, determined for
themselves, what laws of England, as well statute as com-
mon, were of force in the colony. All these laws so deter-
mined to have been of force, which were not contrary to the
constitution, laws and form of government established in
this State, became the laws of this State, by the act of revi-

val, and so continue, unless they have been repealed; or superseded by repugnant legislation. Was the statute of 34 Henry VIII, Chap. 9, among the English statutes adopted by the Colonial Courts, and was it usually in force during the existence, or at any period of the Colonial Government? Tradition furnishes no evidence of it; nor has there been a continuous chain of judicial decisions from the era of the revolution, showing that it was a statute recognized by the Colonial Courts, applicable to the condition of the country and circumstances of the people of that time. The Court cannot decide that this statute was of force at that time, unless it have some sort of evidence of it. I find none satisfactory to my mind and judgment. There is no evidence of its having been regarded as law by our Courts, from the year 1794 to the present time. The concessions by the Courts to its authority are of recent date. They do not go back to the beginning of the present century; and when I reach another head, under which I shall consider it, I expect to show that its provisions were disregarded during and immediately after the revolution. It must be conceded that if it were not usually of force in the colony on and prior to the 14th of May, 1776, it cannot become the law by the adoption of the Courts at this day, however changed our circumstances may be, and however applicable it may have become to our advanced and improved condition. To adopt it would be to enact it, and the Legislature alone can do that.

If it be granted that it is admissible for the Courts now, in the absence of proof of the kind to which I have alluded, to go back to the period antecedent to the 14th May, 1776, and in order to determine the question of an English statute's validity, conjecture the condition of the country and circumstances of the people then existing, and upon that supposititious state of things, form an opinion of the applicability of the statute thereto, and to adjudge that, because, in their opinion *it ought to* have been adopted, it *was* adopted and

was usually in force, it must be inferred that the statute 32 Henry VIII, chap. 9, tested by that rule, was not among the adopted statutes of that day. The evil of buying of titles and pretended rights of persons not being in possession," complained of in the preamble of the statute, could not have been considered a mischief or a wrong, in an unsettled country, where the owner could not occupy all of his immense tracts of land. It was the policy of the government to people the country and settle the lands. The English people owned not a foot of land on the Continent of America, at the time of the enactment of that statute, and the Parliament never extended its operation by express enactment, over the inhabitants of the country after the acquisition and settlement of territory here by England. The statute was passed for a densely inhabited country, where almost every acre of land which had been appropriated, was occupied by well defined boundaries, by a person claiming to be owner, or by tenants of an acknowledged proprietor. Colonial legislation furnishes strong evidence that it was never of force in Colonial Georgia.

By the first section of an act of 24th December, 1768, provision is made for recording deeds made and executed in the British Islands, or in any other of the Colonies of North America, or in Great Britain or Ireland, *Watkins' Digest* 155. It is impossible that deeds made and *executed* abroad, could have been executed by livery of seisen ; and it is exceedingly improbable that it could have been known to the grantor whether there was an adverse possession or not, of land sold and conveyed by him. The fourth section of the same statute declares that no deed of feoffment, bargain and sale, etc. etc., of land or tenements shall be impeached or set aside in any Courts of law or equity for want of atornment or livery of seisin, or enrolment, or for that such conveyance hath been made by way of assignment or endorsement on any other deed of conveyance without other ceremony, nor for any other defect in the form or in the manner of the ex-

Cain and Morris vs. Monroe.

ecution of any such deeds or conveyances or of the assign-
ments or endorsements thereof, either in the first deed or in
any of the mesne conveyances derived therefrom. No diffi-
culty growing out of the adverse possession of the land at the
time of the conveyance is alluded to in this statute. Deeds
as they are represented in the act, were directed to be put on
the record, which was, of itself, a statutory acknowledg-
ment of their validity. As there is no evidence that the
statute was ever of force in the Colony, and the inferences
from Colonial legislation are against it, I cannot consent
to a judgment that it is now the law of this State, and must
determine the contrary.

But if the act was ever of force in Georgia, it was super-
seded, as I will now proceed to show, by the act of 1785,
*Cobb* 164. By the act of 1760, *Cobb* 161, it was enacted
that all conveyances of land and tenements should be made
by deed of bargain and sale, or by deed of lease and release,
or by deed of feoffment. Conveyances by the two former
modes might be made without livery of seisin, but livery of
seisin was necessary to the last mode of conveyance, to-wit:
by feoffment. But whatever mode of conveyance was adop-
ted, there must have been seisin in the grantor. If the
conveyance be by bargain and sale, "there must be an estate
in the bargainor of which he has the *seisin.*" *Watkins on
conveyances* 238. By the second section of the statute 32
Henry VIII, chap. 9, which I am now considering, a person is
prohibited from buying or selling lands or tenements, unless
the person who shall bargain or sell the same, their ances-
tors, or they by whom they claim the same, have been in
possesion of the same or of the reversion or the remainder
thereof, or taken the rents or profits thereof by the space of
one whole year next before the sale or bargain, etc. Hence,
by that statute it was essential to the validity of the sale,
that there should have been *seisin* in him who made the sale.
Prior to the year 1785, deeds of bargain and sale, and other
deeds of feoffment or conveyance had been made, where

there had been no livery and seisin, and which had not been enrolled. The Legislature, on the 22d of February of that year, passed an act, the first section of which declares that no deed of feoffment, bargain and sale, and deed of gift or other conveyances of lands or tenements whatsoever, theretofore made, should be impeached or set aside, in any Courts of law or equity for want of form, or livery and seisin, or enrolment, etc., etc. The legislature did not consider them illegal or invalid, and therefore did not *legalize them.* It rather considered them legal and valid, as having been executed in conformity with the usages and practices of the times, and prohibited the Courts from declaring them otherwise. The second section of the act declares what shall be a good deed of conveyance, and it prescribes all the requisite of such deed, and they are :

1st. It shall be *bona fide.*

2d. A valuable consideration must be paid.

3d. It must be proved in the manner directed.

4th. It must be registered.

A deed thus executed is declared to be good and vaild in law and equity. Seisin in the vendor is not required; the deed is good and valid in law and equity without. Hence he need not have the possession required by the statute of Henry. The sale must be *bona fide.* The vendor must believe that he has the title and owns the land, and that he sells the real title, whether there be an adverse possession or not. It cannot be *bona fide* if the sale involve the offence of maintenance; and that offence is not involved, if the vendor sell the true title or if he, in good faith, believes he is selling such title and the sale be not made *with the intent* to get up a law suit, although a suit *may be* necessary to recover the land. " It is a high offence at common law, as plainly tending to oppression, for a man to buy, *at an under rate, a doubtful title known to be disputed, to the intent* that the buyer may carry on the suit, which the seller doth not think it worth his while to do; and it seems not to be material,

whether the title be good or bad, or whether the seller were in possession or not, unless the possession were lawful and uncontested." *Bacon, Ab. Maintenance, Letter E.* The statute of 1785, protects the true owner of land in the sale thereof, if the sale be made *bona fide* and for a valuable consideration, whether there be an adverse possession or not, and so far as the common law comes in conflict with it, the statute controls. Our land titles are of recent origin, and are easily traced, and a case can hardly arise in that part of the State in which the land was partitioned by lottery, where there is a possession adverse to the right of the true owner, but the title of the adverse claimant originated either in fraud or forgery; and, in the older settled parts of the State, disputes respecting land titles usually grow out of interfering surveys. But be their origin what it may, the positive enactment of the act of 1785, cannot be reconciled with the harsh provisions of the statute of Henry 8th, if that statute had been previously of force, and, when they come in conflict, the latter must give way. If the Legislature were to enact a statute making it a crime and cause of forfeiture of his land, for the rightful owner to sell and convey it, when another person was in possession of it claiming title adversely, whether that fact were known to him or not, it would shock the common sense and moral feeling of the entire country. Yet such is the statute of Henry VIII.

It is unnecessary to consider whether the statute of Henry VIII under consideration, was in affirmance of the common law, for the English statute and common laws, both fall before the act of 1785, which requires neither seisin in the vendor, nor livery of seisin to a purchaser to make a valid conveyance. I think therefore that the refusal of the Court below to give the charge to the jury requested by the plaintiff's counsel, that the statute of 32 Henry VIII, chap. 9, is not of force in this State, was erroneous, and that his judgment must therefore be reversed.

Judgment reversed.

8

BENNING J., concurring.

The Court below decided that so much of the statute of the 32d Henry the VIII, as declares that no person shall sell or buy lands, except the seller, his ancestors, or those under whom he claims the lands, have been in possession of the same, or of the reversion or remainder thereof, or have taken the rents thereof, by the space of one whole year next before the sale, on pain that the seller, and the buyer too, if "knowing the same," shall forfeit the value of the land. And the question is whether that decision was right? The answer to this question, of course, depends on whether the law thus decided to be in force, is in force? To that question I go.

It will be admitted, that the law is not in force, if the following propositions are true:

1st. The Colonists, when they came to Georgia, did *not bring the law with them.*

2d. The Colonists, after coming to Georgia, did *not adopt the law.*

3d. Admitting that the Colonists, when they came, brought the law with them, or adopted it afterwards, they *repealed* it.

4th. And never *revived* it.

5th. The law was never specially *imposed upon* the Colonists, by either the King or Parliament.

6th. The law was never adopted by the Colonists, after they became the *people* of *an independent State.*

Are these propositions true? I think that they are, and I will try to make good my opinion:

1st. Is it true that the Colonists, when they came to Georgia, did *not bring the law with them?*

What is the test for determining whether the Colonists brought with them any particular law or not?

Blackstone says: "Besides these adjacent islands, our more distant plantations in America and elsewhere, are also in some respects subject to the English laws. Plantations or

Cain and Morris vs. Monroe.

Colonies in distant countries are either such, where the lands are claimed by right of occupancy only, by finding them desert and uncultivated, and peopling them from the mother country, or where, when already cultivated, they have been either gained by conquest or ceded to us by treaties. And both these rights are founded upon the law of nature, or, at least, upon that of nations. But there is a difference between these two species of colonies, with respect to the laws by which they are bound. For it hath been held, that if an uninhabited country be discovered, and planted by English subjects, all the English laws then in being, which are the birthright of every subject, are immediately there in force. But this must be understood with very many and very great restrictions. Such colonists carry with them only so much of the English law as is applicable to their own situation, and the condition of an infant colony; such, for instance, as the general rules of inheritance, and of protection from personal injuries. The artificial refinements and distinctions incident to the property of a great and commercial people, the laws of police and revenue, (such, especially, as are enforced by penalties,) the mode of maintenance for the established clergy, the jurisdiction of spiritual courts, and a multitude of other provisions are neither necessary nor convenient for them, and therefore are not in force. What shall be admitted and what rejected, at what times, and under what restrictions, must, in cases of dispute, be decided, in the first instance, by their own provincial judicature, and subject to the revision and control of the King in council; the whole of their constitution being also liable to be new-modeled by the general superintending in the Legislature of the mother country. But in conquered or ceded countries, that have already laws of their own, the King may indeed alter and change those laws; but till he does actually change them, the ancient laws of the country remain, unless such as are against the laws of God, as in the case of an infidel country. Our American plantations are principally of this latter sort,

being obtained in the last century, either by right of con-
quest and driving out the natives, (with what natural justice
I shall not at present enquire), or by treaties.   And therefore
the common law of England, as such, has no allowance or
authority there; they being no part of the mother country,
but distinct, though dependent dominions.  They are sub-
ject, however to the control of the Parliament; though (like
Ireland, Man and the rest,) not bound by any particular acts
of Parliament, unless particularly named."   1 *Black. Com:*
107.

According to this, all British Colonies fall into one of two
classes, viz: the class of colonies planted in newly discov-
ered, " uninhabited" countries ; or the class of colonies con-
sisting of " ceded" or " conquered" countries, having inhabi-
tants and laws of their own.

Let us grant that Georgia belonged to the latter class, (and
it would seem to be Blackstone's opinion that it did,) then,
if Blackstone is right, the laws that were in force over the
colonists of Georgia, were " the ancient laws of the country."
The statute of 32d Henry the VIII. was no part of those laws,
therefore, that statute was never in force over those colo-
nists.

But I deny that Georgia did belong to this class.   I insist
that it belonged to the class of colonies planted in newly dis-
covered *uninhabited* countries.   I admit that there were na-
tive inhabitants of Georgia, and that the territory of Georgia
was obtained from them by treaty or conquest; but then, I
say, that whenever they parted with their territory in either
way, they did so with the expectation and the intention to
*abandon* the territory parted with, to the new owners ; and
that in every instance they acted up to this expectation and
intention.   I say that the aborigines and the new owners
never lived mixed together on the same territory.   This, I
suppose none will dispute.   It follows, that when the new
owners settled on their new territory, it was in fact " *unin-
habited.*"

At any rate, we may safely say, that if the territory was inhabited at all, it was inhabited by savages, almost destitute of law; and quite destitute of law suited to civilized men, such as the colonists were; we may safely say, that this law, such as it was, was never *in fact* in force over the colonists.

Georgia then, I conclude, is to be set down in the class of colonies planted in "uninhabited" countries; and therefore, is to be considered as one, the inhabitants of which drew their laws from the mother country.

What then is this test of his for determining what were the laws which they so drew?

He says that "such colonists carry with them only so much of the English law as is applicable to their own situation, and the condition of an infant colony; such as the general rules of inheritance," &c., that, "the artificial refinements and distinctions incident to the property of a great and commercial people, the laws of police and revenue," &c., "and a multitude of other provisions, are neither necessary nor convenient for them, and therefore are not in force;" that "what shall be admitted, and what rejected, at what times, and under what restrictions, must, in cases of dispute, be decided, in the first instance, by their own provincial judicature, subject to the revision and control" of the King and of Parliament.

This amounts to saying that, if, in the opinion of the colonial Courts, (subject to the revision of the King, or that of Parliament,) any English law is one which was neither *necessary* nor *convenient* for the colonists, it is one, of which we may affirm, that the colonists did not bring it with them.

The State has succeeded to the colony; and the State Courts to the Colonial Courts, and to the judicial powers of the King and Parliament.

We may say, then, that according to this test, if, in the opinion of the State Courts, any English law is one which was neither *necessary* nor *convenient* for the colonists, it is

one, of which we may affirm, that the colonists did not bring it with them.

This is Blackstone's test.   Is this a good test?   I think so. It is, I believe, the test generally, if not universally accepted. It is the one which the compiler of the English statutes in force in Georgia, Gov. Schley, was, at last, compelled to accept in spite of himself.   It is the one on which the commissioners for revising the compilation  seem to have acted.

Gov. Schley, adopting the language of a "learned friend," says, " that the colonists of America brought with them from England, as their birthright, all those laws of the mother country which  were capable of being  so transferred, up to the period of the  settlement of  Georgia.   Therefore, *all the English statutes of a general nature must be considered to have been in force anterior to the revolution."*  He then says, " conceiving  this rule susceptible of application to  the subject under consideration, I have adopted it, &c."   But he admits that in practice,  he could not follow the rule; for he says, that " many statutes, although general in  their nature, were from the subject matter," &c., " totally inapplicable.   It became necessary, therefore, to establish a line between such statutes, as could not at any time have  been suited  to the situation of the people, and such as might reasonably be supposed to be  adapted  to their wants and their use; and then to compare these last with  the Constitution, laws, and form of government since established, and select such as were  not repugnant to them."   *Pref. to Schley's Dig.* 23, 24.

So, that after all, he is compelled to take Blackstone's test, for this is but that test.

The commissioners to revise his  digest rejected some statutes of a *general* nature which he had selected.   Those statutes are to be found in the  appendix to the digest.

I think, then, that I may say, that this test of Blackstone's is the true test.

Taking this as the true test, the question, whether the colonists brought the law in question with them, becomes this :

Was that law such, that this Court's opinion of it ought to be, that it was a law neither *necessary* nor *convenient* for the colonists.

What then is that law?

The substance of it is as follows: No person shall sell or buy lands except the seller, or his ancestors, or those under whom he claims the land, "have been in possession of the same, or of the remainder or reversion thereof, or taken the rents or profits thereof, by the space of one whole year next before" the sale, on pain that such seller, and the buyer too, knowing the same, shall each forfeit the whole value of the lands.

The words, "by the space of one whole year," must be taken to relate equally to the words, "have been in the possession of the same," and to the words, "taken the rents or profits thereof."

This is the more natural construction of the language.

This construction makes the law consistent with itself. Being in possession for a year, and taking the rents for a year, ought to stand on the same footing. Indeed, when the owner is taking the rents, he is virtually in *possession*—in possession by his *tenant*.

The other construction, that by which the relation of the words, "whole year," would be confined to the words, "have taken the rent," would go far towards defeating the object of the law. According to that construction, if a man himself, or his ancestors, or any person under whom he claimed, had *ever, at any time, however remote, been in possession,* the man might sell, although it might be, that at the time of the sale, he was not in possession, and somebody else was. A construction making the law tolerate such a sale as this, would, it must be obvious, defeat in a great measure the object of the law.

These two constructions are the only ones of which the language is susceptible. To say that the language does not forbid a man to sell, though he may be out of possession, and

have been so for years, unless somebody else is in posses-sion, and possession adverse, is not, it seems to me, to con-strue law, but to make law.

Yet, I believe, that there are *dicta*, if not decisions, to the effect that the language does not forbid a man to sell except in this case.   The truth is, that this law is so bad that the effort to get rid of it has produced wild work, both in *dicta* and decisions.   See *Plow.* 85.

I assume, then, that the meaning of the law is, that no per-son is to sell, unless he or those under whom he claims have been in possession for a year, or have taken the rents for a year.

What would be the natural effect of such a law ?   To stop the sale of all lands except those, the possession or the rents of which had been enjoyed for one year at the time of the sale by the seller, or by those under whom he claimed.

Now, was a law that would have stopped the sale of land to such an extent as this, a law that was *necessary* or *conven-ient* for the first colonists of Georgia ?

What was their situation ?   On landing from a wide ocean, they found themselves standing on the soil of the province of Georgia, a territory of vast extent, covered all over with forest, except here and there a patch, and destitute of inhab-itants, except some small bands of roaming savages.   They found all the land owned in undivided parts, by the King and a great corporation—the King having granted to "the trustees for establishing the colony of Georgia in America," "seven undivided parts—the whole in eight equal parts to be divided—of all those lands." *Schley's Dig.* 430, 435. There was not an acre of which, it could be said, that either the King or this corporation had been in possession of for a year, and had taken the rents of for a year.   There was not much more, of which it could be said, that the savage na-tives had ever been in possession of, at any one time for as m uch as a year.   Rents were unheard of.   In a word, there were no lands falling within the exception of the law, and

therefore, no lands to be bought or to be sold, if the law was in operation.

This, then, was the situation of the colonists: they needed land above all things; they had come three thousand miles across an ocean for land; around them lay land in untold quantities; the owners of this land were eager to sell it; they got it only to sell it. And this being the situation of the colonists, it is manifest that any law that would have prevented them from buying this land, would have been a law, not only not *necessary* or *convenient* for them, but a law fatal to them.

The part aforesaid of 32 Henry VIII was such a law.

This, I think, is the conclusion to which the Courts of this State ought to come.

My first reason then for thinking it true, that the colonists *did not bring this law with them,* is, that the law was such that the Courts of this State ought to hold it to be one that was neither *necessary* nor *convenient* for the colonists.

My second reason is founded upon this: The law did not bind the *King*.

The law did not bind the King. " The King is not bound by any Act of Parliament, unless he be named therein by special and particular words." 1 *Black. Com.* 261.

Before the making of the grant to the trustees, *all* the land here belonged to the King. It is manifest, therefore, that this law could not, before that grant, have been operative here, as to any of the land, without the law's binding the King.

After this grant, one undivided eighth still belonged to the King. As to this part then there was no change by the grant. The rest passed to the trustees, on the terms of their paying to the King a specified rent for any of it they might sell; on terms, therefore, that were such as to make it highly to the King's interest that they should sell out the land rapidly. It is equally manifest, therefore, I think, that a law calculated to stop the sales of the land, as this law was, could not, with-

out binding the King, without *affecting the King's interests,* have been operative, even upon this part of the land granted by the King to the trustees.

At the end of twenty years, the trustees surrendered the grant, and the King again became the owner of all the land, except such small part as the trustees might have sold off; and that was comparatively a very small part.

And thus things remained until the revolution; the King from time to time granting off portions of the land to individuals, or authorizing it to be done, but retaining the far greater part of the land himself.

I think I may say then, that this law could not, without binding the King, without affecting the Kings interest, have been operative here, at any time before the revolution.

But, as the King is not mentioned in the law, the law could not bind the King. Hence, the law could not have been operative here, at any time before the revolution.

This law is such, that it is manifest, that all the cases covered by it may be distributed into three classes. One, a class including those cases in which, at the time of the sale, neither the seller nor any one else is in possession; one, those in which, at the time of the sale, the seller is in possession, or in the enjoyment of the rents, but has not been so for a year; and one, those in which, at the time of the sale, another than the seller is in possession, and in possession adversely to the seller. And it will not be disputed that a great majority of these cases will fall into the first two classes.

And the law is also such that it may be treated as consisting of two parts, a prohibitory and a penal part. The prohibitory part prohibiting a sale in any of the cases included in any of the three cases; the penal part imposing a penalty in every instance of such a sale.

Now, it is conceded by all, I believe, that the *penal* part was never in force here *at all,* and that the prohibitory part was never in force here as to any of the cases included in

the *first and second classes*, and these two classes contain a large majority of all the cases.

And it is conceded by this Court, in Pitts *vs.* Bullard, *(3 Kelly,* 17,) that the prohibitory part, though in force as to the cases included in the third class, viz: cases of a sale where there is adverse possession, yet is subject to evasion by the easy shift of a demise on the part of the buyer, in the name of the *seller.*

These particular concessions amount to a general concession, that, of all this law, no part except a very small part, and that a part susceptible of easy evasion, was ever in force in Georgia; and of course, to a concession, that when the colonists came here they brought with them no more of the law than this insignificant part.

And I say that if it be true that they did not bring with them the other, and far greater part of the law, the fact affords a strong argument to show it to be also true that they did not bring with them this insignificant part.

*And this* argument derives support from the *conduct* of the colonists and their successors, both in private and in public life. That conduct shows that they never regarded the law as in force. They ever acted as if none of the law was in force. They were never deterred for a moment from selling their land, by the fact that they might not be in possession of the land, or the fact that some third person might be in the adverse possession of the land.

And in harmony with this was their public conduct, their conduct as legislators.

They passed laws saying that "all the property" of a man shall be bound by a judgment against him, laws that fi. fas. and attachments against a man may be levied on "his estate, both real and personal." And in no instance did they make any exception of the case in which a man's real property may be in the adverse possession of a third person; rather they did what showed that they intended not to except that case, for they provided a remedy, by claim, for that case, and

said, that in that special case, the onus of showing title in the defendant should be upon the plaintiff.

These laws then, amount to a legislative declaration, that a man's land may be sold at the instance of his creditors, although the land may be in the adverse possession of some third person.

The Legislature again and again passed acts disposing of the public lands by lottery; that is, by *chance;* and in some of these lottery acts the Legislature prohibited the sale of chances (thereby implying that *they thought chances saleable* without such a prohibition;) afterwards, by other acts, they repealed the prohibition.

One of the first acts which they ever passed, was a registry act, to the effect that deeds were to be recorded in a specified time; and that, if a man made two deeds for the same land, and the younger was recorded in the specified time, and the older not, the younger should have precedence over the older.

To see the extent of this act, let us suppose a quite supposable case. A. conveys land to B., who, (as is natural,) goes into immediate possession, but fails to have his conveyance recorded in the specified time. Afterwards A. conveys the same land to C., who has his conveyance recorded in the specified time. Now, here, when A. makes the second conveyance, that to C., B. is in adverse possession to A., and under *title*, a conveyance made by *A. himself.* Yet the statute says that this conveyance of his shall yield to that conveyance of C.'s, made after his.

Now, these acts, each and all, cut deeply into this law of Henry the VIII, and yet, in passing them, the colonists and their successors never once refer to that law. They seem to have acted as though they were unconscious of its ever having been passed.

Thus then, the first colonists and all their successors, seem to have *conducted* themselves, both in the halls of legislation and in the walks of private life, in such a way as to show

that if this law was, in any particular, in force over them, they did not know it.

It is conceded, as we have seen, that they left behind them, by much the greater part of the law—we may say all of it, that had any virtue in it.

Put the evidence from those two sources together, and I ask, does it not afford a strong argument to show that the colonists left behind them every part of the law? I think so.

Here, then, is my remaining reason for thinking that the *colonists did not bring this law with them.*

2d. Assuming that I am right in this opinion, may it not be true, that the colonists *adopted* this law by some colonial act? I answer no, there is not, I am confident, any such act to be found.

But let it be granted that the law, in one of these two ways or in some other way, got to be in force.

3d. Then, I say, that in that case, the law was afterwards repealed—repealed by the aforesaid registry act of 1755.

Hitherto I have insisted upon no more than that this act cut deeply into that law. I now say, that it cut that law to the vitals. To drop the figure, I now say, that this act, especially when read in the light of subsequent legislation, is so repugnant to that law, as to amount to *a repeal of the law.*

It is conceded, as we have noted, that no more of this law is in force than so much of it as prohibits the sale of lands, which, at the time of the sale, are held *adversely to the seller.*

This being so, the question will be, does this registry act say, that the sale of lands, thus held, is no longer to be prohibited? And I answer, that the act does, as I conceive, in effect, say so.

The act contains these words, " and such" (conveyances,) "as may be hereafter made within this province, be registered within sixty days from date of the several deeds, conveyances, or mortgages; in failure of which, all such as are

lawfully and regularly registered as aforesaid, shall be deemed, taken, and construed to be prior, and shall take place and be recoverable in law before any and every deed, conveyance or mortgage, which has not been lawfully registered as above, any law, custom, or usage to the contrary notwithstanding." *Cobb Dig.* 159.

Let us apply these words to a very supposable case—a case of which use has already been made: A. is the owner of land; he makes a conveyance of the land to B., who, as is natural, goes immediately into possession of the land. B. fails for "sixty days," to have his conveyance "registered." A., after making this conveyance to B., makes another conveyance of the land to C., who has his deed "registered" "within sixty days." Here, then, is a case in which the land is at the time of the second sale, held adversely to the seller, and is so held under a *perfect* title, and a title derived from that very seller; consequently, here is the strongest case *possible* of a possession adverse to the seller at the time of the sale. There can be but one other case of adverse possession, viz: that in which the occupant holds under some *imperfect* title. And that is, manifestly, a much weaker case than the case in which the occupant holds under a *perfect* title. What then, do these words of the statute say, as to this supposed case? They say that the second deed "shall be deemed, taken, and construed to be prior, and shall take place and be recoverable in law before" the first deed, " any law, custom or usage to the contrary notwithstanding."

And this is saying that the second *sale* shall be good, although made in the face of an adverse possession, and that one of the strongest kind possible.

These words, then, are, so far as this supposed case is concerned, directly repugnant to so much of this law as covers the case of a sale of land held adversely to the seller. Therefore, if that part of the law was ever in force, they repealed it, so far as that supposed case is concerned. And it is admitted that no other part of the law was ever in force.

And I insist, that if, as to this supposed case, a case of sale in the face of an adverse possession, the strongest possible, the words repealed the law, we may say, that, as to every case, they repealed it. If a law is such that it permits murder, is it not also such that it permits manslaughter? such that it permits justifiable homocide?

But am I right in claiming that these words of the registry act, give to the second deed a priority over the first, in this the supposed case? I think that I am.

I stand, first upon the *words;* and the words of an act are sufficient, when they are not ambiguous, and these are not ambiguous. They are, *all* such conveyances "as are lawfully and regularly registered," "shall take place and be recoverable in law before *any* and *every* 'conveyance' not duly registered."

Secondly, I stand upon the *context.* It was not until 1837 that any act was passed introducing exceptions to the universality of these words. In the registry act of that year are the words following: "In all cases where two or more deeds shall hereafter be executed by the same person or persons, conveying the same premises to different persons, the one recorded within twelve months from the time of execution, (if the feoffer have no notice of a prior deed recorded at the time of the execution of the deed to him or her,) shall have preference." *Cobb Dig.* 175.

Here is the first place in which is to be found any legislative declaration that notice of the first conveyance, by the man taking the second, makes any difference.

And it is the only place. The case of a deed taken with notice, then, is the only exception, and this is an exception made long after the passage of the original act.

But I take broader ground. I say that this registry act is repugnant, not only to so much of this law as condemns the sale of land held *adversely* to the seller, but that it is also repugnant to the whole of the law.

What was this registry act? It was an act that required

*all deeds, all mortgages, all wills,* whether already made, or to be made, to be registered within specified times. And it did not stop with an empty command; it went on to say, that every deed which should not be so registered should be postponed to every deed which should be so registered; and that every will which should not be so registered should be void.

And the act further declared, that if any vendor or mortgagor should "presume to execute a second or other deed," he should be punished in a specified way.

This was the act, and what was this but a legislative proclamation to all men, to this effect: " Know ye, that henceforth every sort of title to every sort of property may be investigated and determined, in commerce, by this book of registrations, with which we provide you. Buy from any body; give credit to any body, in whom this book tells you is the title."

This was something new in law, and it was directly repugnant to the particular law in question. That says to all men: "Know ye, that ye are to buy land from nobody unless he, (or those under whom he claims,) has been for a year in the possession of the land, or in the enjoyment of its rents."

The act says, "go by the *possession.*" This law says, "go by the *title.*" Here is direct repugnancy.

And the great principle of this registry act, that men in their dealings one with another, were to look to *title* rather than to *possession,* is again and again recognized, in subsequent legislation.

There was subsequently passed an act which, in effect, abolishes livery and seisin; one which subjects all of a man's lands to his debts, regardless of whether they are in his possession or in somebody elses, or in nobody's; acts which dispose of the public lands by lottery, in which acts there is leave given to those having chances, *to sell their*

*chances*; acts putting realty upon the footing of personalty, in important respects.

And it was in the highest degree expedient, the circumstances of the time considered, that this should be the principle to govern men in their dealings one with another. If it had been so, that no lands could be legally sold, except those of which a man (or those under whom he claimed,) had been in possession for a year, or even except those of which he was in possession at the time of sale,) how long would it have taken Georgia to come to what she is? At the date of this act, probably nearly nine-hundredths of the territory of Georgia was in forest, unoccupied by citizen or subject.

I say, then, that this registry act of 1755, was *repugnant* to the law in question, and therefore, that the act *repealed* the law, if the law was ever in force in Georgia.

4th. I insist that if the law was thus repealed, it was never revived again by the colonists, whilst colonists.

I feel safe in saying, that no *Colonial* act for its revival, is any where to be found.

5th. There is no pretence that the law was ever specially imposed upon the colonists, by the *King* or by *Parliament.*

If I am right thus far, I am authorized to say that, the law was not in force at the time when the colonists became an independent people, and that it had not been in force at any time after 1755, if ever.

6th. And I maintain, that the law was never adopted by them, after they became an independent people. I maintain, that there is no act of the *State* of Georgia by which the law was adopted.

The adopting act of 1784, is not one by which the law was adopted. That act adopts such laws as were in force on the 14th day of May, 1776, and no others. And this law, I think I have shown, was not in force on that day.

The legislative resolution, by which Schley's Digest came into existence, is not an act by which the law was adopted.

That resolution merely says, that a compiler shall be appointed; that his compilation, after being submitted to the revision of "three learned in the law," shall be approved or disapproved by the Governor; that if approved by him, he shall subscribe for two thousand volumes of it, if it does not cost more than four dollars a volume. *Schley's Digest* X. This is by no means saying that every statute which the digest, to be made, may contain, shall be considered as in force, or that no statute which the digest may not contain, shall be considered as not in force.

Nor has the resolution ever been so understood. It was not so understood by the compiler himself. He puts several statutes in an appendix to the digest, saying, that they "are considered by the compiler to be of force," "but the gentlemen composing the committee of revision, think differently, and therefore they are not permitted to have a place in the body of the work." Note preceding pref. note to appendix.

The 43d of Elizabeth, commonly called the statute of charitable uses, is not in Schley's Digest. Yet in *Beall vs. The Executors of Flox*, 4 *Ga.*, 422, it is said, that "the *principles* of the statute of 43 *Elizabeth*, have been adopted in this State." And see *Warthen vs. May R. M. Charl.* 614.

We have several digests of our own statutes. Yet it has never been supposed, I believe, that if those digests contain a particular statute, it followed necessarily, that the statute was not in force, or, that if they did contain a particular statute, it followed necessarily, that the statute was in force.

The fact then, that the 32d Henry the VIII, is to be found in Schley's Digest, proves no more than this, that the compiler of the digest and those appointed to supervise his work, *thought* that the statute was in force. This itself, certainly is much; but, it is not enough, I think, to outweigh what I have herein presented in favor of a contrary opinion, especially since it is true, (as I think I may say with confidence that it is,) that this statute got into the digest in violation of what was the *avowed principle* on which the digest

was compiled, viz: the principle that, "such statutes as could not at any time have been suited to the situation of the people," were to be excluded. *Pref* 24.

But if the law in question was not adopted by the adopting act of 1784, or by the act (resolution,) in relation to Schley's Digest, then I feel myself at liberty to assume, that it was not adopted by any act of the *State.*

These are my reasons for thinking the law not to be in force.

I am aware that this Court has held a contrary opinion. But I do not think that the Court ever did so on much consideration. It is certainly true, that the Court in delivering its opinion, has not adverted to the views on which my opinion is founded. And an opinion that did not take those views into consideration, would be one which, I think ought not to be considered conclusive.

I think, then, that the Court below in deciding that this law is in force, decided wrong.

LUMPKIN J., dissenting.

A difference of opinion imposes upon me, the unpleasant necessity of maintaining, single handed, my opinion against that of my esteemed colleagues in this case. However unequal the conflict, I shall not shrink from it; duty to myself, as well as the country, impels me to maintain my opinion firmly.

The only question in this case is, whether a conveyance of land, by one against whom the land conveyed was held adversely, by claim of title, is void?

When this Court was organized in 1845, we found the affirmative of the foregoing proposition to be settled law throughout the State, and had been from time whereof the memory of the oldest attorneys ran not to the contrary. It seemed to be a doctrine at all times familiar to our people and constantly acted upon by them. The title in dispute,

like thousands of others in the State, was based upon it. Hence we inferred that being a well established principle of the common law, and peculiarly adapted to a new country, it was actually in force in this State before the revolution, as "suitable to the circumstances" of the colonists, especially had we a right so to conclude, as the 32d Henry the VIII, adopted in England for the purpose of more effectually enforcing this principle, had been embraced in Governor Schley's compilation, as one of the British statutes which was binding in Georgia.

Without permitting ourselves, therefore, to inquire whether this was a good or a bad law, we recognized and applied it as law, leaving it to the Legislature to change or repeal it, should it be deemed expedient to interfere.

It is suggested that the statute of Henry VIII has been recently repealed, even in England, by the 8 and 9 Victoria, and this is true. Having accomplished there the purpose for which it was intended, and the reasons in which it originated having ceased to exist. I remark, however, that it was abrogated by the Parliament, and not by the Courts.

The ancient common law mode of conveying land was by livery of seizin; and consequently, necessarily excluded the idea of a sale of lands by one not in possession. And Lord Coke, commenting upon the text of Littleton, that " no entry could be reserved to a stranger upon a feoffment," says, " here Littleton reciteth one of the reasons of the common law, and the reason hereof is, for avoiding maintenance, &c., and therefore, nothing in action, entry, and re-entry could be granted over." 2 *Thomas' Coke*, 99, 214, *a.*

And this, no doubt, is the true foundation of the rule, namely: " nothing in action" merely, could be conveyed; or in other words, the vendor, not having the possession himself, nor the power to put the purchaser in possession, could not sell a lawsuit.

We have said that delivery of possession was the essential part of a feudal transfer. But the statute of cases was made

the medium of transfer, without delivery of possession.   The statute of Enrolments was passed to conteract the effects of this change, as much as possible, by giving some notice and notoriety to the transaction.   And soon after came the 32 of Henry VIII, called the " Bill of Bracery, or buying of titles," or the "Pretended Title Act," which was expressly designed to preserve the transfer of possession as an ingredient of title.

"This statute," said Chief Justice Montague, in Partridge *vs.* Strange, *(*1 *Plowden,* 88,*)* " has not altered the common law, for the common law, before the statute, was, that he who was out of possession ought not to bargain, grant, or let his title; and that if he had done so, it would be void.   Then, the statute was made in affirmation of the common law, and not in alteration of it.   And all that the statute has done is, it has added a greater penalty to that which was void by the common law."

"It is a mistake," said Mr. Justice Duer, in delivering the opinion of the Court, in Hoyt *vs.* Thompson, *(*3 *Sandford's Rep.* 430,*)* " to suppose that the law of champerty is derived from the provisions of the statute of Henry VIII, which we have re-enacted, and which forbids the conveyance or sale of lands by a party out of possession.   The statutory prohibition is only a partial affirmance of a general rule of the common law."

We assume it to be true, upon undoubted authority, that the common law forbids every transfer of a disputed title, whether relating to real or personal estate of a person out of possession, and where the property is held at the time, in good faith, by another, under an adverse title, and the reasons of public policy, upon which the interdiction is founded, apply with equal force to every description.   *Coke Litt.* 314; *Bacon's Abr. Grant, D*; 1 *Hawkins' Pls. Cro. Book i, ch.* 84, *s.* 1; 2 *Stor. Eq. Juris,* 1048; 4 *Black. Com.* 135; *Burke vs. Green,* 2 *Ball & Beatty,* 517; *Cholmondely vs. Clinton,* 4 *Bligh's N. S.* 4; *Baker vs. Wheling,* 3 *Sumner,* 475; *Powell vs. Kumler,* 2 *Atkins,* 224; *Shackam vs. Bun-*

*der*, 1 *Eden*, 308 ; *Wallace vs. Duke of Portland*, 3 *Ves. Jr.* 493 ; *Stevens vs. Bagnel*, 15 *Ves. Jr.* 139 ; *and the more recent case of Roper vs. Edwards, Young & Call, Ex. Rep.* 431.

In this last case, Lord Abinger, in a most elaborate opinion, establishes conclusively the point, that the right of an assignee or purchaser will never be admitted or enforced, unless it appears that the assignor or vendor had, at the time of the transfer, a substantial possession or an immediate capability of personal enjoyment of the property conveyed ; and that in other cases, where there was adverse possession at the time of the transfer or sale, but the naked right of action only, such transfer is not upheld by the law, and that a purchaser under such circumstances has not a *locus standi in publico.* It is the conveyance of nothing but a disputed title—a lawsuit which is now and always has been illegal and void. The thing conveyed being only available by a hostile action. I will only add that this whole doctrine is fully and satisfactorily discussed in the notes to Rowe & Dawson. 2 *White & Tudor's Eq. Cas.* 201–241.

Blot out then if you please the "Bill of Bracery," and the doctrine for which we contend remains untouched ; sustained as it is by all the books, text-writers, and reporters, from Brooke to Blackstone.

Without then overruling the law thus firmly fixed and uniformly maintained, we cannot give effect to a deed made while there is adverse possession. Such a decision cannot be made without an entire subversion of a principle coeval, as we have seen, with the law itself, and without an utter abandonment of the rules by which Courts, in judging of the validity of such transactions, have hitherto been governed. We should, contrary to the policy of the law, and the settled maxims and practice of the Courts, be giving sanction to the sale of a lawsuit, and the purchase of a disputed title; and consequently will have exceeded the authority conferred on us by law.

In some of the States, the statute of 32 Henry VIII has

been re-enacted literally; in some, has been modified; in others, it is regarded and acted upon as a part of the common law; while, in a few, it has no existence whatever. Four of the old States, to-wit: Pennsylvania, New Jersey, New Hampshire and Delaware, and, I believe, three of the new, namely: Illinois, Missouri and Louisiana, making seven in all, stand against the remaining twenty-four, including Georgia, who, by adopting the common law, has, as we have shown, adopted, as a part of it, the doctrine that a conveyance by a party out of possession. with an adverse possession against the grantor, is void as against the party in possession. In other words, as against the latter, the grantor has passed no right whatever to the grantee. This State is committed to this doctrine, not only by her adoption of the common law, in 1784, of which it was and ever had been a part, but likewise by the reception, approval and distribution of Schley's Digest, containg the 32 Henry VIII as one of the British statutes of force in this State, and which was passed "in affirmation of the common law, and not in alteration of it," and which has been uniformly held to be "suitable to the circumstances of our people."

Should it be asked, as it has been, why not adopt the whole of this Act, to-wit, its penalty? We reply *first*, in the language of Senator Seward, in the case of Livingston against the Peru Iron Company. (9. *Wendell's Reports* 537.) "I am free to admit that the cases are numerous which show that the rigid features of the statute have been relaxed as to the conviction for the penalty imposed by the 8th section; and I will not undertake to defend, upon principle and sound reason, the anomaly, that a deed may be void, because made in violation of the statute, and yet the parties to the deed be held altogether acquitted of the crime which is constituted by a violation of the statute. Yet such is the principle which has, if I mistake not, obtained and has prevailed so long, that it would be manifestly unsafe, for the sake of harmonizing the decisions, to extend the principle as is contended for

in this case. The *scienter* is a necessary ingredient in the crime of a violation of this statute; and yet the question of *scienter* never was raised in an action between a party claiming under the deed, and the person holding adversely. In the case of *Wickham vs. Conklin*, (8. *Johns. R.* 226,) which was a *qui tam* action under the statute, the Court distinctly recognize the principle that adverse possession will operate to defeat a deed, although the making or taking the deed does not subject the party to the penalty of the statute. The same principle seems to be conceded in the case of *Lane* against *Shears*, (1. *Wendell* 433,) while it is freely conceded that the relationship of the parties in a deed may excuse them from the penalties of the Act; it is also most obvious that without exception the law has been received and settled in numerous cases, so far as I can find, without the intervention of a single conflicting decision, that adverse possession renders inoperative every grant of the premises except a release, so the law is laid down in *Kent's Com. vol.* 4, *p.* 438 ; and I agree with the illustrious author, that the Legislature, in incorporating the same provision in the revised statutes, have only enacted what was universally understood to be the law before the revision. 1. *R. S.* 739, *S.* 147. To reverse principles of law, thus solemnly and so long settled, would be most unwise; and upon a full view of that ground, I am clearly of the opinion, that, were it necessary to adopt one or other alternative, the Court ought, rather, to restore the strictness of the statute, as to the infliction of the penalty for champerty and maintenance, than, for the purpose of harmonizing the consequences of the Act, to abolish the doctrine that adverse possession renders void any deed executed by a party claiming title to the premises."

In addition to the masterly opinion of Senator Seward, from which the foregoing extract is made, and which commends itself to the grave consideration of all reflecting minds, and should especially be pondered well by those who would substitute their individual opinions in the place of the

Cain and Morris vs. Monroe.

well digested judgment of the Judicial world, I would re-
mark, in the *second* place, that nothing is more common than
to adopt a part of an English statute, as adapted to the con-
dition of the country, and to reject a part as unsuitable. This
is true as regards the statute of 43d Elizabeth, commonly
called the statute of charitable uses. But in this case, as
the one under consideration, it will generally be found that
the part adopted has its foundation deeply laid in the com-
monly law, and the Act is intended only to give it addition-
al force, or to prescribe more definitely the mode and man-
ner of applying and enforcing it. One thing is certain, viz:
that while no case is reported or recollected, where the pen-
alty of the statute has been inflicted, the unbroken tenor of
adjudications in Georgia has been to hold the deed itself void,
as against the party in adverse possession; and that the
understanding of the Bar and of the people has been in ac-
cordance with this usage.

If it required then an *Act of the British Parliament to* en-
able a right of entry, whether vested or contingent, to be dis-
posed of by deed, I protest, under all the circumstances,
against the exercise of this power by my worthy associates,
while at the same time, I cheerfully concede that none are
more competent to make or repeal laws. Even they, howev-
er, have no authority to change the law from what it is and
always has been. Especially do I object to judicial legis-
lation in this case, as the Legislature itself, at its last session,
it is understood, solemnly refused to alter the doctrine of the
common law. Nor do I wonder at it, seeing that the general
policy of it remains in a great degree unquestioned and up-
on the preservation of which, the security of estates so great-
ly depends. Our professional brethren from Cherokee and
South-Western Georgia insist most earnestly, that we shall,
by setting aside the law, as it has been heretofore interpreted,
expose their sections to harassment which would inevitably
ensue from the sale of pretended titles.

We cannot too often insist that the Courts are to expound

Cain and Morris vs. Monroe.

the laws, not to make them.  They have no facilities for such an enquiry.  And there is this wide difference between Bench law and that enacted by the General Assembly.  The former always operates retrospectively, and overturns all that has been done, and by unsettling everything, re-opens the flood-gates of litigation.  The other prescribes a rule of conduct for the future, and protects at the same time past transactions; and is thus much more benign in its effects. Is it right that contracts made, as in the present case, upon the faith of adjudications, commenced at so early a period, acquiesced in so long, and so often repeated, should be vacated and set aside at this late period?

The will of the Legislature is binding upon the judiciary, and this will may be expressed, by a positive enactment or a refusal to act, where they have the power, which is equally significant of the legislative mind.  The will of the community, made known in either of these ways, should be paramount.  In this instance, we have both.  The Legislature, as we have before said, not only adopted this doctrine as a part of the common law, and re-affirmed it, by the reception and distribution of Judge SCHLEY's Digest, but what is equally expressive, has acquiesced in it, as declared by the Courts for nearly three-quarters of a century.  The Legislature can precisely adapt the remedy to the evil; Courts cannot.  Another weighty consideration why the repeal of laws should be referred to the Legislature, rather than to the Courts.

Some general expressions to be found in the old registry Act of 1785, are supposed to have repealed by implication the rule of the common law, for which we are contending; as well as the provisions of the Act of 32 Henry VIII.  The preamble to that Act, recites that "many deeds of bargain and sale and other deeds of feoffment or conveyance have been made, which have not been enrolled, or livery of seisin had, or which may be deficient in point of form, when it was the legal intent of the party to sell and lawfully convey the same."

Cain and Morris vs. Monroe.

It is therefore enacted, "That no deed of feoffment, bargain and sale, and deed of gift or other conveyance of lands or tenements whatsoever, heretofore made, shall be impeached or set aside in any Courts of law or equity for want of form or livery of seisin, or enrolment, or for any other defect in the form or in the manner of the execution of any such deed, or in any of the *mesne* conveyances derived therefrom, so that the right were or would have been in the person or persons conveying, if such defects had not happened in such conveyances or in the manner of the execution of the same," &c.

The next section prescribes the mode in which deeds are to be made in future; and declares that "all deeds of conveyances, by way of bargain and sale *bona fide* of lands and tenements, and executed under hand and seal, &c., shall be good and valid, &c., according to the true intent, construction and meaning thereof." *Cobb* 164, 165.

I simply remark, that this Act has been upon the statute book for upwards of seventy years, and has never been supposed to have any application to the question under discussion, as it most obviously has not. It assumes that the person selling had the right to convey and intended to do so. Whereas, in the case of alienation of land held adversely, the vendor has no right to sell, and the *bona fide* of the transaction has nothing to do with it, so far as the validity of the deed is concerned. The Act of 1785, was designed to cure and legitimate certain defective conveyances theretofore executed and to dispense with certain requisites in deeds, or livery of seisin, &c., in conveyances thereafter to be made. But the grantor himself by no act of his could confirm and make good a conveyance made by him during an adverse possession; neither could the Legislature do it for him. Nor did they inconsiderately attempt it by the Act of 1785, or any other statute. The Act of 1785, was a wise measure framed for a widely different purpose.

It is always dangerous to invoke general terms used in

statutes, and especially Acts which are ancient, and put a meaning upon them, confessedly not within the mind of the law-maker.

And this Court acted upon this principle in the Temperance case in 15. *Ga. Reports* 408.

For these, and other reasons, I am constrained to dissent from the judgment of a majority of the Court.