No. 8618.

## THE BOARD OF COMMISSIONERS OF BARTHOLOMEW COUNTY v. JAMESON.

SUPREME COURT.—*Judgment.*—*Res Adjudicata.*—The judgment of the Supreme Court upon a question directly presented by the record settles that question in all subsequent proceedings in that cause.

SAME.—*Harmless Error.*—*Demurrer.*—It is a harmless error to sustain a demurrer to a paragraph of answer which pleads a defence admissible under another paragraph not demurred to, or where the defence so pleaded is allowed to be proved on the trial.

CORONER.—*Authority to Employ Chemist.*—The authority of a coroner to employ a chemist to discover whether poison caused the death of one on whose body he holds an inquest does not restrict him to the employment of a resident of the county.

SAME.—That a coroner was, by corrupt appliances of others, induced to employ a chemist, is no defence to a suit by the chemist to recover compensation for his services.

MAINTENANCE.—One having an interest in the result of a suit, as a guarantor, may lawfully assist in its prosecution.

PARTIES.—*Plaintiff.*—*Assignor and Assignee.*—Where a person receives money of another, and in consideration thereof agrees to assign to the latter any judgment he may obtain on a claim held by him against a third person, it is an equitable assignment of the claim, and the assignee only can sue therefor.

From the Bartholomew Circuit Court.

*F. T. Hord* and *W. B. Hord,* for appellant.

*J. L. McMaster, A. Boice* and *C. E. Clark,* for appellee.

ELLIOTT, J.—This case is in this court for the second time. The complaint of the appellee was held to be sufficient when the case was here upon the former appeal, and by this decision one of the principal questions in the case was settled. *Jameson* v. *Board, etc.,* 64 Ind. 524. In holding the complaint good, the court decided that the coroner has authority to employ a skilled person to make a chemical analysis of the stomach of one supposed to have come to his death by poisoning. We think this ruling was correct. County officers ought to be allowed to take such measures as shall tend to the detection and conviction of persons guilty of felonious homicide, and the

statute committing to the coroner the authority to employ skilled chemists should receive a liberal rather than a strict construction.

The questions as to the authority of the coroner to employ, and as to the liability of the county to pay, are conclusively settled by the former judgment of this court. The judgment of the appellate court upon a point directly presented by the record is, as to that point, in all subsequent proceedings in the cause *res adjudicata.* The effect of such a decision goes, so far as the particular case is concerned, beyond the rule *stare decisis.* If we were disposed·to question the soundness of the ruling made when the case was first here, the principle stated would forbid our doing so, but we have not the slightest disposition to depart from the doctrine then declared.

The fifth paragraph of the answer of the appellant alleges that the appellee was not a physician and surgeon at the time of his employment by the coroner, and that he did not render any services as a physician or surgeon. The record does not require us to decide whether a skilled and competent chemist, who is neither a physician nor a surgeon, can recover compensation for making a chemical analysis of the stomach of a deceased person. The general denial is pleaded, and if the defence asserted by the paragraphs under mention is sufficient, it is admissible under· the general denial, and consequently no available error was committed in sustaining the demurrer.

One of the defences set forth in the answer is as follows: " The defendant admits that the coroner requested the plaintiff to render the chemical analysis set forth in the complaint, but avers that the *post mortem* examination was made and had in the presence and view of the dead body, and upon the same, by one Samuel M. Linton, a competent surgeon and physician, who was required to and did perform said service, at the instance and direction of the said coroner; that the plaintiff did not appear, and was not at any time present at said inquest in the presence and view of the said dead body;

but defendant charges and avers that the only surgical service rendered in or about said inquest was performed by said Linton; that said Linton removed from said dead body the stomach, and the said coroner transferred the same to plaintiff, then being and residing in Marion county, in the State of Indiana, who then made a chemical analysis of said stomach to detect poison therein, which was the only service rendered by the plaintiff; that the plaintiff did not attend or render any service at said inquest, or at any other place as a physician or surgeon. The only service rendered by him was as a chemist, in attempting to detect poison in said stomach; and the coroner was not authorized to employ a chemist for said purpose."

So far as this paragraph counts upon the fact that the services were not performed at the autopsy, but were performed in a different county, it is clearly bad, under the ruling made upon the former appeal. There is neither a statute nor any rule of law, nor any consideration of public policy, requiring us to hold that the coroner can only employ men living in his own county. It would be unreasonable to confine the authority to employ to persons residing within the county, and equally so to require that the analysis should not be made in any other county than that represented by the officer giving the employment. It can certainly detract nothing from the skill of the expert, or the value of his analysis, that he chances to live in the county of Marion rather than in the county of Bartholomew. Nor was it requisite that the analysis should have been made in the county where the death occurred. The law does not require that it shall be made there. The important thing is the accuracy and skilfulness of the analysis. The place where it is made is wholly immaterial.

The counsel for appellant ask us to adhere literally to the words of the statute and hold that only physicians and surgeons who attend the *post mortem* examination are entitled to compensation. We are unwilling to do this, for to do it

would defeat the purpose for which the statute was enacted. The reasoning of the court in delivering the judgment in the case, when it was here the first time, supplies a complete refutation of the appellant's argument. It was then said by HOWK, J., in delivering the opinion of the court, that "It is very clear, we think, that it was the intent and purpose of these statutory provisions to clothe the coroner of the county, whenever he should be notified that the dead body of any person, supposed to have come to his death by violence or casualty, was within his county, with the necessary power to properly enquire, and if possible ascertain, how, in what manner and by whom such person came to his death, and whether any one was guilty of said death, and the degree of guilt. The welfare of society and the interests of public justice alike demand, that such an enquiry or inquest should be thorough and complete, to the end, that if death has been caused by a criminal agency, the guilty may be discovered, and receive merited punishment, and the innocent may, perhaps, be freed from unjust suspicion."

The sixth paragraph is, in substance, as follows:

That the said Mary Prather, on whose body said inquest was held, was, at the time of her death, and for a long time prior thereto, a resident of Jackson county, in the State of Indiana; that prior to her death, to wit, on the —— day of ——, 187—, her husband, John C. Prather, procured the Michigan Mutual Life Insurance Company to issue to him a policy of insurance on her life for the sum of $1,000; that she lived at all times, contracted her sickness and died in Jackson county, and was buried in Bartholomew county, Indiana. Defendant charges and avers that said inquest was caused and instigated by the said Michigan Mutual Life Insurance Company and its agents, in the interest of said company, and the said coroner made said inquest, and caused said chemical analysis to be made, at the suggestion and instigation of said company and its agents, for the purpose of seeking and detecting some cause of death, or pretext whereby

said company might avoid the payment of said policy of insurance; that the said inquest was made and prosecuted for said purpose by said coroner, for a consideration paid to him by said company, which plaintiff well knew at the time of his said employment by said coroner to make said analysis, and said employment was fraudulent, and did not bind defendant.

We regard this answer as insufficient. It is bad, for the reason that it does not aver that there were no grounds justifying the coroner in taking measures to ascertain the cause of Mary Prather's death. If there were reasons justifying the investigation and the employment of expert chemists, then it does not matter who instigated the proceedings. If a crime has actually been committed, it is immaterial what motives prompt the person who sets the investigation on foot. A murderer is none the less deserving of detection and punishment because the person who instigates the coroner to investigate the circumstances and manner of the death is influenced by selfish or even malicious motives.

The payment of a consideration to the coroner, to induce him to make the proper investigation, can not be deemed to deprive the appellee of the right to compensation for his services. If there was reasonable ground for holding the inquest, and for employing appellee to make the analysis, he is entitled to receive the reasonable value of the services, notwithstanding the fact that a public officer may have wrongfully accepted compensation for performing a duty which his official position required of him. The corrupt act of a public officer can not be deemed a sufficient reason for suppressing an investigation; and to hold that he may not employ the means to make his investigation effective would be, in effect, to declare that, having accepted money from the instigator of the inquest, all proceedings must end. If the appellee's claim itself grew out of a fraud on his part, it would be otherwise; but he can not be defeated upon the ground that a wrong was done by another, although that other chances to be a public officer.

It is true that, in such a case as that stated by the answer, the interests of the insurance company and the public would be in some degree the same, but this supplies no reason for denying a recovery to one who renders services upon the request of the duly authorized officer. Although the result of the investigation might confer a benefit upon the insurance company there was none the less reason for using energetic and effective means to ascertain the cause of death. The duty to hold the inquest and to make the investigation thorough and complete is not affected by the fact that some individual citizen, or some private corporation, may derive some benefit from the investigation.

The seventh paragraph of the appellant's answer is substantially the same as the eighth, and, if the former was bad, no substantial injury was done the appellant in sustaining appellee's demurrer. If, however, they are not the same, it is still clear that no harm resulted from the ruling on the demurrer, for the record shows that the appellant was allowed to prove all matters that could have been proved had the seventh paragraph been held good.

The case was submitted to the court upon an agreement that the appellee should recover judgment unless his answers to interrogatories proved some one of the defences pleaded by the appellants.

The answers to interrogatories are, in substance, as follows: " The chemical analysis sued for in the complaint was made solely on the request of the coroner of Bartholomew county; the request for the analysis was made by the coroner, and the agreement was made with him, in his official capacity; the agreement with him was that the county should pay me $150; I told him that I sometimes had trouble in getting pay for such services from the counties; the agent of the Michigan Mutual Insurance Company then said that my services should be paid for, or that he would see that they were paid for; this was the only promise that was made by any agent or attorney of the company.

"After the analysis was made I filed my claim, which was not allowed; after the refusal of the commissioners to allow the claim, I went to see McMaster and Boice, attorneys at law, and employed them to collect the claim; sometime after this, being in need of money, I went to McMaster and Boice to see if I could not make some arrangements to get money on my claim against Bartholomew county, from the Michigan Mutual Insurance Company, and told them I needed money before I could make collections from the county; they told me they would give me $150 for the company, provided I would assign the company any judgment which I might recover against the county; this I agreed to do, and they paid me $150; this money was not given to me as payment of my claim against the county, nor was there any talk that it was to constitute a payment."

In other answers to interrogatories it is stated that the insurance company did not advance or pay any money except the $150 mentioned; and that the attorney and an agent of the insurance company were with appellee when he made the contract with the coroner, but had nothing to do with the transaction except as stated in the answers copied; and it is also stated that the company did not agree to pay any of the expenses of collecting the claim, and that the appellee was to bear all such expenses.

It is urged by the appellant's counsel that the insurance company became a party to the original contract, and that its payment to Jameson extinguished his claim. This argument assumes too much. The evidence is that the money was not delivered or accepted as a payment. The insurance company was not a party to the contract in any other capacity than as the guarantor of the county, for, as the uncontradicted testimony shows, the company's verbal agreement was to pay in case the county did not. A delivery by a guarantor to the creditor of the amount of his claim against the principal debtor is not necessarily an extinguishment of the debt, and certainly

not where there is an agreement between the guarantor and creditor to the contrary.

It is also contended that the evidence shows a champertous contract, and that, therefore, the appellee must fail.   It is settled that the rule of the common law upon the subject of champertous contracts prevails in this State.   *Stotsenburg* v. *Marks*, 79 Ind. 193; *Greenman* v. *Cohee*, 61 Ind. 201; *Quigley* v. *Thompson*, 53 Ind. 317; *Scobey* v. *Ross*, 13 Ind. 117.

It is clear, however, that the rule does not, and can not, prevail in this State in its full extent since the code of 1852, for it makes radical changes in the common-law rule upon the subject of the assignment of choses in action.   The common-law rule is limited in its operation by several provisions of the code, but we deem it unnecessary to notice them. Many of the courts where the code system prevails have denied its force altogether, and the tendency of modern decisions in America is to restrict rather than enlarge the operation of the rule.    *Mathewson* v. *Fitch*, 22 Cal. 86; *Cain* v. *Monroe*, 23 Ga. 82; *Allard* v. *Lamirande*, 29 Wis. 502; *Bentinck* v. *Franklin*, 38 Texas, 458; *Roberts* v. *Cooper*, 20 How. 467; *Stoever* v. *Whitman*, 6 Binney, 416; *Coughlin* v. *N. Y., etc., R. R. Co.*, 71 N. Y. 443 (27 Am. R. 75); *Orr* v. *Tanner*, 17 Am. L. Reg. (N. S.) 759.   The rule has often been criticised by the English courts; even as early as *Master* v. *Miller*, 4 T. R. 320, *vide* p. 340, unfavorable criticism was made.   But our decisions, as we have seen, declare the rule to be in force in this State, although the extent to which it prevails has not been defined.   It may, however, be safely assumed that the rule is narrowed rather than extended, since to hold otherwise would be to oppose the letter and spirit of our code, as well as the general principles of what Austin calls our "judge-made law."    *Patterson* v. *Nixon*, 79 Ind. 251.

Assuming, for the sake of the argument, and for that purpose alone, that the common-law rule prevails in all its rigor, still the case is with the appellee.   We affirm this because the in-

surance company had an interest in the collection of Jameson's claim, and a party having any interest, direct or remote, immediate or contingent, may rightfully aid in the maintenance of the litigation.   It is laid down in the old books, that there are many acts in the nature of maintenance which become justifiable from the circumstances under which they are done. They may be justified, where the party has an interest in the thing in variance, as when he has a bare contingency in the lands in question.   Bacon Abridg., Title Maintenance.   The rule that if the party has an interest he may assist in the litigation can not be on principle, nor is it by the adjudged cases, confined to cases where land is the subject of controversy. Wherever there is an interest, the right to assist in maintaining the suit exists and may be exercised.   *Thallhimer* v. *Brincker-hoff*, 3 Cow. 623 ;   *Gilleland* v. *Failing*, 5 Den. 308 ;   *Cooley* v. *Osborne*, 50 Iowa, 526.   Coke says that champerty exists " when one maintaineth the one side without having any part of the thing in plea or suit ; " and this can not be deemed to extend to one who has a part, although it is in the form of a contingent interest.   It would be a harsh rule that would prevent a guarantor or surety from aiding the creditor in his attempt to make the debt off of the principal debtor, and we are glad to say it has no place in our law.

We have assumed that the guarantor has an interest in the action brought to coerce payment from the principal debtor, and we are now to show that this assumption is a just one. A guarantor or surety may, on default of the principal, pay the debt and himself enforce payment, and this he could not do unless he had an interest in the contract, out of which his rights grow and from which his liability springs.   Brandt Suretyship, section 176.   It makes no difference that the contract is a verbal one, not enforceable under the statute of frauds, for the guarantor may waive the benefit of the statute, pay the debt, and sue his principal.

In *Beal* v. *Brown*, 13 Allen, 114, the facts were very much the same as in the present case, and the court said :   " The

statute of frauds can not avail the plaintiff. * Although the verbal guaranty was within it, and might have been avoided,, if the defendant had seen fit to rely upon the statute when, called on by the plaintiff's creditor for the payment of the debt,, the defendant was not bound to set it up. He had a right, to perform his parol undertaking." *Cahill* v. *Bigelow*, 18 Pick.. 369 ; *Anderson* v. *Spence*, 72 Ind. 315 (37 Am. R. 169). As still further showing the interest of the guarantor, there may be cited the rule of equity investing the guarantor with power to compel the creditor to sue the principal, and our statute providing that he may compel proceedings by a notice in writing. Brandt Suretyship, section 208. It must follow from these rules that. the guarantor has some interest in maintaining the prosecution of an action against the principal by the creditor, and, having: such an interest, he may advance money to secure the proper prosecution of the creditor's action.

There still remains a perplexing question. Is the appellee the real party in interest? The evidence shows that. the appellee received the full amount of his claim ; that what he received was not in payment of his claim, and that he agreed, in consideration of the money received by him, to assign such a judgment as he might recover to the insurance company. It seems to us that he thus divested himself of all. beneficial interest in the claim, and vested it in the company. If he retained no substantial interest, then his assignee became the real party in interest, and, under our code, was the only proper plaintiff. In *Rock County Bank* v. *Hollister*, 21 Minn.. 385, and *Third National Bank, etc.*, v. *Clark*, 23 Minn. 263, it, was held that one who held notes for collection could not maintain an action upon them. Mr. Pomeroy, after a careful review of the cases, gives an unqualified approval to the case of *Eaton*, v. *Alger*, 57 Barb. 179, where the like doctrine was maintained,. although the case was reversed by the Court of Appeals. Pomeroy Remedies, section 131. This author cites with commendation our cases of *Swift* v. *Ellsworth*, 10 Ind. 205, and *Gillispie* v. *Ft. Wayne, etc., R. R. Co.*, 12 Ind. 398. In *Cum-*

*mings* v. *Morris*, 25 N. Y. 625, notes were transferred, to be paid for when collected, and it was held that the assignee was the real party in interest. The court said: "The plaintiff may, without let or hindrance from the former holder of the notes, receive and appropriate the money that may be collected on them to his own use. This gives him the legal title and makes him the proper party plaintiff. (*Selden* v. *Pugh*, 17 Barb. 468; *Hastings* v. *McMurdy*, 1 E. D. Smith, 273; *James* v. *Chalmers*, 2 Seld. 209; *Ross* v. *Bedell*, 5 Denio, 467.)"

The principle which decides the sufficiency of this answer was declared in *Killmore* v. *Culver*, 24 Barb. 656. It was there said: "Is, then, this plaintiff the real party in interest? It seems to me from the evidence given by himself and Tanner, * that he is not. He is not at all interested in the event of the suit, for, should he recover, the money must go to Tanner, and should he fail the loss would not be his, but would fall upon Tanner." Our own cases assert substantially the same doctrine as do those of New York. In *Treadway* v. *Cobb*, 18 Ind. 36, it was said: "The transfer was upon a parol promise to pay the money all over to the assignor, and was made for a special purpose, other than that of defrauding creditors, it is true, but not for transferring the beneficial interest in the note. The answers, if true in point of fact, were a bar to the suit, and the demurrer to them should have been overruled." *Smock* v. *Brush*, 62 Ind. 156; *Claflin* v. *Dawson*, 58 Ind. 408.

In Kentucky, Wisconsin, California and Nebraska, the same general doctrine is declared and enforced. *Carpenter* v. *Miles*, 17 B. Monroe, 598; *Wiggins* v. *McDonald*, 18 Cal. 126; *Gradwohl* v. *Harris*, 29 Cal. 150; *Cornyngham* v. *Smith*, 16 Iowa, 471; *Rogers* v. *Omaha, etc., Co.*, 4 Neb. 59. Mr. Pomeroy, in concluding his review of the authorities, says: "The rule deduced from these authorities" (*i. e.*, those cited by him) "is plain and imperative: The assignee need not be the legal owner of the thing in action; if the legal owner, he must of course bring the action; but, if the assignee's right or ownership is for any reason or in any manner equitable, he is still

the proper plaintiff, in most of the States the only plaintiff, although, in a few, the assignor should be joined as a plaintiff or as a defendant. The plain intent of the statute is to extend the equity doctrine and rule to all cases." Pomeroy Rem., section 127.

In *Reynolds* v. *Quaeley*, 18 Kan. 361, the doctrine is carried so far as to hold that although the assignment is after action brought, the assignee must prosecute the action, and that the assignor's administrator can not continue the prosecution.

An equitable assignment vests the interest in the assignee, and constitutes him the real party in interest. An equitable assignment is defined to be "Such an assignment as gives the assignee a title which, though not cognizable at law, equity will recognize and protect." Abbott L. Dict. 433. Acting upon this rule, it was held in *Spratley* v. *Hartford Ins. Co.*, 1 Dill. 392, that, where an insured had given an order for the amount due upon the policy, the action must be brought by the holder of the order, as he was the real party in interest. So, where an order is given upon a particular fund, it operates as an equitable assignment of so much of the fund as the order specifies. *Indiana, etc., Co.* v. *Porter*, 75 Ind. 428 ; *Wheatley* v. *Strobe*, 12 Cal. 92. In such cases the assignee must sue. *Walker* v. *Mauro*, 18 Mo. 564. But, without further citation, we quote, as declaring the true rule upon this subject, from the author heretofore referred to : " Not only does the rule prevail when the assignment is absolute and complete, and the assignee is the legal owner of the demand ; it prevails with equal force in cases where the assignment is simply equitable in its character, and the assignee's title would not have been recognized * under the old system, but would have been purely equitable." Pomeroy Rem., section 127.

It is quite certain that the appellee has received all he can ever get out of his claim, for, by the terms of his agreement, the judgment, the moment it is rendered, will, in equity if not at law, belong to the insurance company, and, this being true, he has no possible interest in the claim. His assignee, how-

ever, has such an interest as equity will recognize and protect; it is therefore the assignee and not the assignor who must invoke judicial assistance. It must either be true that the claim was extinguished by the payment of the $150, or it is true that the beneficial interest passed to the insurance company; and as the first alternative is, as we have seen, not true, the last must be.

We can reach no other conclusion than that the evidence sustains the appellant's answer that the appellee is not the real party in interest.

Judgment reversed.

Petition for a rehearing overruled.