The **MONARCH INSURANCE COMPANY OF OHIO,**
Plaintiff,

v.

David **SIEGEL, et al., Defendants.**

Civ. No. F 84–81.

United States District Court,
N.D. Indiana,
Fort Wayne Division.

April 30, 1986.

See also, D.C., 625 F.Supp. 693.

Stephen P. Kenney, Chicago, Ill., Thomas M. Kimbrough, Fort Wayne, Ind., for plaintiff.

Neil F. Sandler & Frederick A. Beckman, Fort Wayne, Ind., for Siegel and L & S.

Gary M. Capelli, Fort Wayne, Ind., for Ora Ackerman.

### ORDER

WILLIAM C. LEE, District Judge.

This matter is before the court on a motion for summary judgment filed by plaintiff Monarch Insurance Company of Ohio ("Monarch") against defendants David Siegel ("Siegel"), L & S Equipment, Inc. ("L & S") and Ora Ackerman ("Ackerman"). The defendants have filed memoranda in opposition, and Monarch has filed its reply. For the following reasons, the motion for summary judgment will be granted.

This cause arises out of the attempts to determine liability in the aftermath of a plane crash during an attempted landing at the Indianapolis International Airport in February 1983. Monarch, as the named insurer of the aircraft, sued Siegel, L & S, Ackerman, and several passengers, claiming that it was not liable under the insurance policy for the damage caused by the crash. On January 2, 1986, this court granted Monarch summary judgment as against Siegel and L & S, holding that two coverage exclusion clauses in the policy relieved Monarch of liability under the policy. Now Monarch again moves for summary judgment, this time seeking a judgment for the amount paid by Monarch to Piper Acceptance Corporation ("PAC"), a holder of a conditional sales contract lien on the aircraft, as well as prejudgment interest and attorney fees.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may only be granted if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Thus, summary judgment serves as a vehicle with which the court "can determine whether further exploration of the facts is necessary." *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975).

In making this determination, the court must keep in mind that the entry of summary judgment terminates the litigation, or an aspect thereof, and must draw all inferences from the established or asserted facts in favor of the non-moving party. *Munson v. Friske*, 754 F.2d 683, 690 (7th Cir.1985). The non-moving party's reasonable allegations are to be accepted as true for purposes of summary judgment. *Yorger v. Pittsburgh Corning Corp.*, 733 F.2d 1215, 1218–19 (7th Cir.1984). A party may not rest on the mere allegations of the pleadings or the bare contention that an issue of fact exists. *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.), *cert. denied*, 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). *See also Atchison, Topeka & Santa Fe Railway Co. v. United Transportation Union*, 734 F.2d 317 (7th Cir.1984); *Korf v. Ball State University*, 726 F.2d 1222 (7th Cir.1983). *See generally* C. Wright, *Law of Federal Courts*, § 99 (4th ed. 1983); 6 *Moore's Federal Practice*, § 56.15 (2d ed. 1984).

Thus, the moving party must demonstrate the absence of a genuine issue of material fact. Even if there are some disputed facts, where the undisputed facts are the material facts involved and those facts show one party is entitled to judgment as a matter of law, summary judgment is appropriate. *Egger v. Phillips*, 710 F.2d 292, 296–97 (7th Cir.1983); *Collins v. American Optometric Assn.*, 693 F.2d 636, 639 (7th Cir.1982). *See also Bishop v. Wood*, 426 U.S. 341, 348, 348 n. 11, 96 S.Ct. 2074, 2079, 2079 n. 11, 48 L.Ed.2d 684 (1976).

In light of these principles, the facts relevant to the disposition of this motion are as follows. On August 23, 1982, L & S purchased a Piper Turbo Seminole aircraft from Tasco Aviation Supply Company. L & S, by Siegel's signature, signed a Conditional Sales and Security Agreement, which was immediately assigned to PAC. This

agreement contained the following language:

> If there is a default ... and we notify you that you must immediately pay your full indebtedness hereunder, you must pay us interest from the date of notice until the date you make final payment at the highest interest rate allowed by law, plus all costs of collection including reasonable attorney's fees.

\*　\*　\*　\*　\*　\*

10. *Default.* Buyer shall be in default under this Agreement upon the happening of ... (d) Loss, theft, damage, destruction, sale or encumbrance of or to the Aircraft....

\*　\*　\*　\*　\*　\*

11. *Remedies.* In the event of default, the full amount of the Time Balance remaining due ... shall become immediately due and payable without notice, and Seller or its agent may ... (a) Collect the same by suit or otherwise.

A rider to the Conditional Sales Agreement sets forth the payment schedule under the Agreement, and sets the interest rate as being 13% for the first twenty-four months, and 1.5% above the prime rate of the Pittsburgh National Bank for all months thereafter, with the proviso that this latter rate "shall never go below 15% nor above 20% per annum."

L & S and Siegel obtained insurance on the plane by taking out a policy issued by Monarch through Crump Aviation Underwriters. For an additional premium, L & S and Siegel also had issued a "Breach of Warranty Endorsement" whereby Monarch agreed to pay PAC under the policy. The Breach of Warranty Endorsement contained the following language (hereinafter referred to as the "subrogation clause"):

> Whenever the Company shall pay the Lienholder any sum for loss or damage under this policy and shall claim that, as to the Insured or owner, no liability therefor existed, the Company shall, to the extent of such payment, be thereupon legally subrogated to all the rights of the Lienholder against the Insured or owner and in and to all the property held as security for indebtedness: or the Company may, at its option, pay the said Lienholder the whole amount due or to become due from the Insured or owner, with interest, and shall thereupon be entitled to receive a full assignment and transfer of all the rights of said Lienholder against the Insured or owner of all property held as security for the indebtedness.

The accident occurred in February 1983, and when PAC sought payment under the Conditional Sales Agreement, Siegel directed PAC to Monarch who, on September 1, 1983, paid PAC $93,442.22 as full payment under the Conditional Sales Agreement. To obtain its payment, PAC executed a Proof of Loss claim form and an assignment of all its rights under the Sales Agreement to Monarch. The Proof of Loss claim filed by PAC contained the following language:

> The Lienholder hereby agrees to accept the sum of $93,442.22 in full satisfaction and settlement of all rights which the said Lienholder enjoys under BREACH OF WARRANTY ENDORSEMENT provisions of Policy No. CC169933 issued to L & S Equipment, Inc. on February 24, 1983. In consideration of said payment, the Lienholder further agrees that, to the extent of this payment, The Monarch Insurance Company of Ohio shall be legally subrogated to all the rights of the Lienholder as respects the indebtedness and, in and to all the property held as security for the indebtedness under the above-mentioned chattel mortgage and note. Upon payment of the loss in accordance with the terms of said BREACH OF WARRANTY ENDORSEMENT, Lienholder will assign and transfer all of its rights under and interest in said chattel mortgage and note and the security therefor.

The assignment was executed on August 17, 1983.

In mid-September 1983, Monarch sent a letter to L & S demanding payment of the

$93,442.22. L & S did not pay, and this lawsuit followed.

In responding to this motion, L & S has admitted that Monarch is entitled to receive the $93,442.22 plus prejudgment interest. What is at issue is the *rate* of prejudgment interest and whether Monarch is entitled to attorneys fees under the provisions of the Conditional Sales Agreement. Monarch seeks to have the Agreement's interest rate of 13% for the first eighteen months, and 15% thereafter, applied in the calculation of prejudgment interest, and also seeks to invoke the Agreement's provisions regarding attorney's fees. Monarch believes the Agreement applies by virtue of the assignment and subrogation of PAC's interests. L & S argues that because of the nature of Monarch's promise under the Breach of Warranty Endorsement, and because the Proof of Loss claim of PAC speaks of Monarch being "subrogated to" the interests of PAC, the Assignment is without effect and thus Monarch is entitled only to indemnification rights as subrogee, which means repayment of the $93,442.22 and nothing more (except statutory 8% prejudgment interest).

Ackerman, who piloted the plane and has admitted his negligence, opposes summary judgment on the grounds that a material issue of fact exists. According to Ackerman, Monarch can only sue him through L & S and Siegel by virtue of a subrogation of their rights against him. Ackerman claims that such a subrogated right would be subject to whatever defenses he could raise against L & S, and he argues that a defense does exist: that L & S allegedly agreed to insure Ackerman and failed to do so. Ackerman therefore concludes that the factual dispute about whether such an agreement was made precludes summary judgment.

### Claims Against L & S and Siegel

█ The essence of the dispute between Monarch and L & S on the motion for summary judgment is whether the provisions of the Conditional Sales Agreement can be invoked by Monarch as the assignee of PAC. Monarch claims that PAC executed an assignment of all rights in consideration for Monarch's payment under the Breach of Warranty Endorsement, and that both Monarch and PAC had the freedom to enter into this contractual arrangement. L & S argues that Monarch can only obtain indemnification for its payment (i.e., repayment of the $93,442.22 paid to PAC) both because the nature of an insurance contract is such that Monarch only agreed to indemnify and because Monarch was only able to obtain a subrogation of PAC's rights. Resolution of this dispute requires a foray into the law of assignments and subrogation, with a focus on the question of whether Monarch is entitled only to indemnification because of the operation of law or because of the documents executed by Monarch.

The court begins by focusing on the second issue first: did Monarch obtain a valid assignment of PAC's rights under the Conditional Sales Agreement by virtue of the documents executed by the parties in this cause? Or do those documents only grant Monarch subrogation rights? To answer these questions, the court must carefully examine the documents executed and the relationships these documents created between and among the parties.

The entanglement of these parties began on August 23, 1982 when L & S purchased the plane from Tasco Aviation Supply Company. To finance the purchase, L & S executed a Conditional Sales Agreement, granting Tasco a security interest in the plane, and promising to pay the purchase price according to its provisions. Among those provisions which L & S agreed to was the interest rate and attorney fees provisions quoted above, as well as a clause which stated that the Agreement, and the rights and obligations under it, were assignable.

By virtue of this Agreement, Tasco became a conditional vendor. Tasco immediately assigned all of its interest in and rights under the Agreement to PAC. Because "an assignee of a conditional sales contract acquires all of the remedies to

which the conditional seller is entitled," *Highland Realty, Inc. v. Indianapolis Morris Plan Commission,* 136 Ind.App. 208, 199 N.E.2d 110 (1964); *Royal Indemnity Ins. Co. v. Shue,* 134 Ind.App. 322, 182 N.E.2d 796 (1962); *Heyns v. Meyer,* 46 Ind.App. 45, 91 N.E. 973 (1910), PAC in effect became a conditional vendor itself.

L & S and Siegel then came to Monarch and had an insurance policy issued to cover the plane. As part of that policy, and upon the payment of an additional premium of $95.00, a Breach of Warranty Endorsement was issued. That Endorsement was not signed by PAC, although PAC certainly stood to benefit from its provisions, because the Endorsement in effect promised PAC payment if the plane was damaged. Thus, PAC was a third party beneficiary to the insurance contract between Monarch and L & S.

The Endorsement contained the subrogation clause, which gives Monarch two options in a situation (like this present one) where Monarch pays the Lienholder (PAC) and then claims it was not obligated to pay under the policy. The first option is to be subrogated to the rights of the Lienholder against the Insured (L & S) *to the extent of the amount it paid* to PAC. The second option allows Monarch to pay the entire amount due the Lienholder from the insured, and then to take a full assignment and transfer of all rights of the Lienholder against the Insured. Because this language is part of the policy issued to L & S, the court must conclude that L & S contractually agreed that Monarch had these two options available to it.

When PAC came to Monarch looking for payment under the Endorsement, it submitted a Proof of Loss claim. That claim appears to invoke both options in the subrogation clause, for PAC agrees that "to the extent of this [$93,442.22] payment, [Monarch] shall be legally subrogated to all rights of the Lienholder as respects the indebtedness," while also promising to assign and transfer all of PAC's rights under and interest in the chattel mortgage and note. In a separate document, PAC re-

leased all claims it had under the Endorsement and "in further consideration of the payment of the [$93,442.22], PAC irrevocably sells, assigns and transfers to Monarch all of its rights and interest in" the Conditional Sales Agreement. The question thus becomes: which option did Monarch avail itself of?

The court concludes that Monarch was seeking to pay the entire amount due PAC and to take an assignment of PAC's rights. The most convincing evidence of this is in the Proof of Claim itself. There, PAC sets out figures for its statement of loss which includes amounts of total interest charged under the note as well as a rebate of interest (apparently for interest not yet accrued). The claim form refers to the $93,442.22 amount as the "Net Pay-off Amount." These facts suggest that what was really occurring was that Monarch was paying off the amount due under the Conditional Sales Agreement (the note), which is the necessary predicate to exercising the second option.

This conclusion can be justified from a logical standpoint as well. The language of the first option entitles Monarch to subrogation to the extent of the amount paid to PAC. This option would be useful if Monarch paid, say, a $10,000 claim under the Endorsement because it would give Monarch a position as good as the Lienholder for recovering its payment. When the entire amount due under the note is paid, however, it makes no sense to take only subrogation rights and pass up an assignment of any additional rights existing under the note. The mere inclusion of the second option in the Endorsement is therefore evidence that in a full payment situation, Monarch would want an assignment of all rights as opposed to taking a subrogated position.

Why, then, the language of subrogation in the Proof of Loss claim? Or in Monarch's letters and briefs? The answer may well lie in the rather metaphysical distinction between assignments and subrogation. A generic definition of subrogation is "the substitution of one person in the place of

another ... so that he who is substituted succeeds to the rights of the other in relation to the debt or claim...." *Black's Law Dictionary* 1279 (5th ed 1979).[1] An assignment has the same effect of substituting parties—the assignee takes the place of, and succeeds to the rights of, the assignor. In that regard, an assignment is much like a subrogation.[2] Thus, to speak of Monarch being "subrogated to" PAC is not wholly incorrect, although it might be confusing when trying to determine whether Monarch is asserting its rights as a subrogee or assignee.

The distinction apparently revolves around the way in which the substitution of rights takes place. An assignment is contractual, an affirmative act between assignor and assignee. The transfer of rights is contemplated by the parties. On the other hand, a subrogation of rights can occur by operation of law, without a contractual act of transfer of the rights.[3] For example, when a guarantor or surety is required to pay a debt by a creditor, the guarantor/surety acquires a subrogated position by virtue of his payment of the debt; there is no contractual undertaking whereby the rights of the creditor are passed to the guarantor/surety—at least no contract is necessary.

Thus, the court does not find that PAC's use of subrogation language, or Monarch's reference to itself as a subrogee, indicates that Monarch was not seeking to gain an assignment of PAC's rights under the Conditional Sales Agreement. An examination of the documents leads the court to conclude that an assignment was intended. The Breach of Warranty Endorsement clearly contemplates an assignment in a situation where Monarch pays off the balance due, which is what occurred here. PAC's assignment assigns all of PAC's rights under the Conditional Sales Agreement (including the right to collect attorney fees and to receive a higher rate of interest) to Monarch. The court therefore concludes that the documents executed by PAC effectuated an assignment of PAC's rights as a conditional vendor to Monarch.

The remaining issue, therefore, is whether this contractual assignment is effective as a matter of law. An analysis of L & S' memoranda in opposition to the motion, as well as its argument to the court, reveals five possible arguments for finding that, as

1. In fact, some Indiana courts refer to subrogation as the "doctrine of substitution." *See Vonderahe v. Ortman*, 128 Ind.App. 381, 147 N.E.2d 924, 925 (1958).

2. There are, however, recognized differences. In *Imel v. Travelers Indemnity Co.*, 152 Ind.App. 75, 281 N.E.2d 919 (1972), a case involving the question of whether an insurance company can demand a subrogation of a personal injury claim in exchange for payments under the policy, the court stated:

We agree with the majority of the jurisdictions which make a distinction between an assignment of a claim for personal injuries and subrogation of one's rights arising from a personal injury. A few of the distinctions are: subrogation secures contribution and indemnity, whereas assignment transfers the entire claim; the consideration in subrogation moves from subrogor to subrogee, whereas in an assignment the consideration flows from the assignee to the assignor; assignment contemplates the assignee being a volunteer, whereas subrogation rests on a contractual duty to pay; assignment normally covers but one claim, whereas subrogation may include a number of claims over a specific period of time; subrogation entails a substitution, whereas assignment is an outright transfer. *Id.* 281 N.E.2d at 921. Attempting to plug the facts of this case into these distinctions produces mixed results. Here, PAC transferred its entire claim, and consideration moved from Monarch to PAC, suggesting an assignment, while Monarch was contractually bound to pay by virtue of the Endorsement, and a number of claims were transferred, suggesting subrogation. The distinctions here are rather fine (what is the difference between a substitution and a transfer? And which consideration does one focus on when measuring the "direction of the flow" of consideration between the parties?), which is why the court concludes that the difference between subrogation and assignment may be largely metaphysical in nature.

3. In fact, many Indiana courts state that the right of subrogation "is not founded upon contract, express or implied, but upon principles of equity and justice." *Home Owners' Loan Corp. v. Henson*, 217 Ind. 554, 561, 29 N.E.2d 873, 975 (1940); *Warford v. Hankins*, 150 Ind. 489, 50 N.E. 468 (1897); *Ohio Casualty Group of Ins. Cos. v. Royal-Globe Ins. Co.*, 413 N.E.2d 678, 680 (Ind.App.1980).

a matter of law, Monarch is entitled only to subrogation rights despite the execution of the assignment. The first is that the contract which Monarch entered into is an insurance contract, and by their nature insurance contracts are for indemnity only. The problem with this position is that, while the general nature of the contract involves insurance, it is the specific terms of the contract which must control, as those terms are what Monarch and L & S agreed upon at the time the insurance policy was issued. Here, L & S paid an additional premium to obtain a Breach of Warranty Endorsement so as to allow L & S to have its obligation under the Conditional Sales Agreement paid off in the case of certain contingencies. That Endorsement contained the subrogation clause, which gave Monarch the option to pay off the amount due under the Sales Agreement and take an assignment of PAC's rights. In effect, L & S contractually agreed that Monarch could go beyond mere subrogation or indemnity and obtain something more—an assignment of rights that are greater than the rights available through subrogation. Thus, even if the general nature of insurance contracts is that of indemnification only, L & S entered into a contract which added certain rights to the subrogation available by virtue of this being an insurance contract. Having agreed to these terms, L & S cannot now take refuge in the general nature of insurance contracts. It must be held to the terms of its deal.

A second argument against the efficacy of the assignment is that the payment of a note is a discharge of the debt set forth in the note, thereby entitling the person paying off the note only subrogation rights. L & S cites *Merchant's Nat'l. Bank and Trust Co. v. Winston*, 129 Ind.App. 588, 159 N.E.2d 296 (1959). In *Merchant's Bank*, a certain Holliday guaranteed a note executed by a corporation and certain individuals. When the debtors defaulted on the note, Holliday paid the full amount of the outstanding principal and interest. The bank treated the loan as paid and the obligation under the note cancelled. The bank also assigned the note to Holliday. The *Merchant's Bank* court ruled that Holliday had a right of subrogation only, and was therefore not entitled to an award of attorney fees. L & S contends that this case establishes both that payment of the debt discharges the debt, entitling the payor to subrogation only, and that an assignment of the underlying note does not alter this result.

A close reading of the *Merchant's Bank* opinion, however, reveals a different approach to the problem than the one offered by L & S. The opinion makes it clear that the contract giving rise to Holliday's obligation to pay upon the debtor's default— the contract of a surety or guarantor—"is to be construed according to the intention of the parties" and "should receive a fair and reasonable interpretation so as to obtain the objects for which the instrument was designed and the purposes to which it is applied." 159 N.E.2d at 302. The court then proceeded to ascertain the intent of the parties, finding that the underlying debt was expected to be paid in full, and that the bank's treatment of the payment as retiring the obligation indicated that "the intention of these parties was such that they mutually considered the debt paid and the obligation cancelled." *Id.* 159 N.E.2d at 303. Thus, the *Merchant's Bank* court was not simply applying an inflexible rule of law in finding that a discharge of the debt occurred so as to give rise only to subrogation rights; rather, the court was obviously looking at the facts of the transaction so as to ascertain what the parties intended the payment to mean.

Applying this "intention of the parties" methodology to this case, it appears that Monarch and L & S, by virtue of the subrogation clause in the Breach of Warranty Endorsement, intended that a full payment of the amount due and owing under the Conditional Sales Agreement would result in an assignment of PAC's rights, not a discharge of the debt and resulting subrogation. Thus, the holding of *Merchant's Bank* leads the court to conclude that Monarch is entitled to more than mere subroga-

tion rights precisely because Monarch and L & S contracted for more.[4] As the Indiana Supreme Court stated in *The Board of Commissioners of Bartholomew County v. Jameson*, 86 Ind. 154, 160–61 (1882):

> A delivery by a guarantor to the creditor of the amount of his claim against the principal debtor is not necessarily an extinguishment of the debt, and certainly not when there is an agreement between the guarantor and creditor to the contrary.

Nor does the language in *Merchant's Bank*, that the assignment of the note to Holliday "makes no difference," apply here. Because the *Merchant's Bank* court had already decided that the payment of the debt had extinguished the obligation of the note, the note had no further effect on the parties. With the note no longer applicable, Holliday could only sue on the subrogation right which arose by law through his payment of the debt of another. In such a situation, the assignment would "make no difference" because the note was useless to Holliday, except perhaps as evidence of the obligation he had paid off. But this case should not be read as holding that an assignment can never affect the rights of a person paying on a debt of another, for it is clear that the emphasis on carrying out the intent of the parties means that it may be possible that parties could intend something more than mere subrogation.

The court therefore finds that this second argument must fail. The *Merchant's Bank* case establishes the importance of looking at the intent of the parties, and the intent as manifested in this case indicates an intent to give Monarch rights greater than mere subrogation rights.

A third argument against enforcing the consequences of the Monarch-PAC assignment is that an assignment cannot create any rights greater than subrogation. L & S cites 73 Am.Jur.2d *Subrogation* § 111, which states:

> The general rule is that it is not necessary to a complete legal subrogation that the one to whose rights another is subrogated shall make a formal assignment of the securities or other rights to the subrogee, for equity, regarding that as done which ought to have been done, treats the assignment as having been made as soon as the right of subrogation arises ... It has been held that one who asserts a right of subrogation, by assignment or otherwise, must first show a right in equity to be subrogated, and where such a right is clearly shown an assignment adds nothing to his right thereto; if he recovers, it is by virtue of a right in equity, not by virtue of a legal right under an assignment.

Because subrogation entitles one to indemnity only, *Smith v. Wells*, 72 Ind.App. 29, 122 N.E. 334 (Ind.App.1919), L & S concludes that this language limits Monarch's recovery to the amount it paid, in effect preventing Monarch from recovering under the assignment.

The flaw in L & S' argument is that L & S apparently concludes that the above quoted language has a far greater scope than it really does. This language *does not* say that a payor of a debt is entitled only to subrogation rights. Rather, it recognizes that, because subrogation is a principle of

---

**4.** This fact does much to deflate an additional argument based on the *Merchant's Bank* case. At argument on this motion, counsel for Ackerman pointed to the language in the case where the court distinguished between payment of a note and purchase of a note. Ackerman interpreted the case as holding that when a person has a legal obligation to pay, then he cannot get an assignment of all rights of the payee. While that appears to be the holding of the *Merchant's Bank* court on the facts before it, it is also clear that the emphasis on the intent of the parties is vital to an examination of the nature of the relationship and obligations of the parties. Holliday was simply a guarantor of a note who was required to pay upon default of the debtor. There was no agreement by the debtor to allow an assignment of a claim upon payment of the debt. Here, L & S specifically contracted to allow Monarch to take an assignment upon full payment under the subrogation clause. In effect, L & S abrogated Ackerman's interpretation of the *Merchant's Bank* holding by agreeing that Monarch could get more rights via an assignment.

equity, an assignment of a right of subrogation is surplusage, as equity would recognize the right without a formal assignment of it. Thus, an assignment *of a right of subrogation* would "add nothing" to that right. However, an assignment of some right other than subrogation can still be effective, precisely because the right being asserted under that assignment would not be the right of subrogation. Here, Monarch is asserting something other than a right of subrogation: the rights of the conditional vendor under the Conditional Sales Agreement by virtue of its assignment from PAC. True, it seeks part of what it would get by asserting a right of subrogation—the $93,442.22 payment on the debt. That may be part of the reason why Monarch refers to its claim as that of a subrogee. But it is also clear that it asserts claims as an assignee, which are rights outside the scope of the right of subrogation. The above quoted language does not foreclose the assertion of those rights.

The fourth argument against applying the assignment is that the statements in the Proof of Loss claim form controls. L & S cites *Bituminous Fire & Marine Ins. Co. v. Culligan Fyrprotexion, Inc.*, 437 N.E.2d 1360 (Ind.App.1982). In that case, an insurance company brought an action as subrogee to recover an amount paid to a general contractor for water damage caused by the failure of a sprinkler system installed by the defendant subcontractor. The court stated:

> The "proof of loss" form from which Bituminous' claim is derived states, "... the assured does hereby subrogate to the insurer...." The right of subrogation is one of indemnity only, and the insurer is not entitled to recover a greater amount than it has paid to the assured. *Smith v. Wells,* 72 Ind.App. 29, 122 N.E. 334 (1919); *Gieseke v. Johnson,* 115 Ind. 308, 17 N.E. 573 (1888)....
> Furthermore we note that neither Chance nor Bituminous had a cause of action for attorney fees, incidental expenses, or punitive damages. Relative to the claim for attorney fees and incidental

expenses, we note generally that expenses of litigation and attorney fees may not be included in damages unless they are provided for by some prior contract or statute. *Cooper v. High,* 262 Ind. 405, 317 N.E.2d 177 (1974); *Perry County Council v. State ex rel. Baertich,* 157 Ind.App. 586, 301 N.E.2d 219 (1973).

437 N.E.2d at 1371. L & S points to the language of PAC's Proof of Loss form in which PAC recognizes that Monarch is legally subrogated to the rights of PAC. What L & S does not mention is the language of the form wherein PAC promises to assign all of its rights to Monarch as well. Thus, it is unclear from the language of the Proof of Loss form itself that only a subrogation was intended. Clearly, Monarch and L & S, via the subrogation clause in the Breach of Warranty Endorsement, evidenced a desire to have an assignment occur. The fact that PAC executed an assignment is also evidence that an assignment, and not a mere subrogation, was intended. The court has already concluded that this evidence establishes that an assignment occurred. It is therefore hard to see how the Proof of Loss form can be interpreted as only subrogating Monarch to PAC's position, especially in light of this evidence and the "intention of the parties" test of *Merchant's Bank.*

The second half of the above quotation is also interesting because it recognizes that attorney's fees and cost of litigation can be included in damages if they are "provided for by some prior contract." It is indisputable that the Conditional Sales Agreement allowed for the collection of a higher rate of interest and attorney fees in the case of a default under the contract. Monarch, by virtue of the assignment from PAC, is asserting those rights in this motion, and the *Bituminous Fire & Marine Ins. Co.* case is strong support for Monarch's position. Thus, far from limiting Monarch's recovery, the case appears to allow for Monarch to receive all that it seeks in damages.

The fifth and final argument against application of the assignment is that the

Breach of Warranty Endorsement controls, and that a failure to specify the award of interest or fees in that document forecloses Monarch's ability to collect them as damages. L & S cites *Evans v. Century Casualty Co.*, 159 Colo. 596, 413 P.2d 457 (1966). In that case, Evans purchased an airplane and executed a chattel mortgage. Century insured the plane, and included a breach of warranty endorsement whereby Century would pay the mortgage lienholder in the event of a loss. The plane crashed while being operated in a manner that fell under one of the policy exclusions. Century paid the noteholder, took an assignment of the note, and then sued Evans for indemnification, contending the excluded use was a breach of warranty. Century sought an award of fees, as the note contained a provision for the award of fees, though the breach of warranty endorsement did not.

The *Evans* court held that a new trial needed to be held, but did comment in dicta on the issue of whether Century was entitled to an award of fees:

In the absence of a contract provision or statute to the contrary, attorney's fees cannot be recovered in an action on an insurance policy....

There is no statute in Colorado authorizing attorney's fees in cases such as this one, nor does the breach of warranty endorsement provide for payment of attorney's fees. It is true the promissory note to the bank had such a provision; however, the plaintiff's suit is actually based upon the breach of warranty endorsement and not on the note.

Century's claim against Evans had no validity unless Century could prove that Evans breached his warranty to it. Unless such a breach occurred, Evans owed nothing to it and the note was merely evidence of the amount it paid to satisfy the mortgagee bank's claim. The gravamen of the action was therefore breach of warranty and not liability on the note as such. Century was acting as an indemnifier for Evans when it paid the bank and as such is only entitled to such sums as it paid to carry out its indemnification agreement. It certainly was not a bona fide purchaser for value. It is therefore clear that Century was not entitled to recover according to the terms of the note but if they could recover at all, it would be only according to the amounts which it paid the bank for the note.

*Id.*, 413 P.2d at 461.

Assuming for a moment that the *Evans* court's analysis is correct, and that Monarch's suit is on the Breach of Warranty Endorsement, what the court would be required to do is look to the terms of that Endorsement to see what remedies Monarch would have in a situation where it paid PAC and then claimed that a policy exclusion applied. In such a situation, the subrogation clause would come into effect, and under that clause, L & S and Monarch both agree that Monarch could pay off the entire amount due and get an assignment of PAC's rights under the Conditional Sales Agreement. In other words, the language of the Endorsement inevitably leads back to the language of the Sales Agreement, because the second option set out in the subrogation clause in effect incorporates the rights under the Sales Agreement into the Breach of Warranty Endorsement. Thus, while the endorsement involved in *Evans* did not allow for attorney fees to be part of the damages collectable, the Breach of Warranty Endorsement involved in this case does allow for Monarch to seek fees and a higher rate of interest because it specifically allows Monarch to get an assignment and pursue the rights so transferred. The court therefore concludes that if the *Evans* case applies here, it serves to reinforce the conclusion that Monarch is entitled to pursue the remedies under the Sales Agreement which were assigned to it by PAC.

Thus, the court concludes that there is no legal justification for preventing Monarch from exercising the rights it gained through the assignment from PAC. Monarch and PAC certainly had the right to enter into such a contract, and L & S contractually agreed that Monarch could

obtain such an assignment under the Breach of Warranty Endorsement. In the light of such evidence of contractual agreement, the court finds that Monarch is entitled to assert the rights of the conditional vendor under the Conditional Sales Agreement.

Further, even if this was a subrogation situation alone, it is not completely clear that Monarch would not be able to rely upon the terms of the Conditional Sales Agreement. L & S cites several cases in which the right of subrogation is said to be a right of indemnification only. *See Smith v. Wells*, 72 Ind.App. 29, 122 N.E. 334 (1919); *Gieseke v. Johnson*, 115 Ind. 308, 17 N.E. 573 (1888). However, the Seventh Circuit has held that attorney fees allowed for in a contract may be recovered by a subrogee. In *Ruckman & Hansen, Inc. v. Contracting & Material Co., Inc.*, 328 F.2d 744 (7th Cir.1964), a contractor gave a subcontract to a subcontractor, C & M, on a highway project. C & M then assigned the subcontract to a paving company, NAPC, who obtained a performance bond from an insurance company, Home. NAPC, did not do the job, and the contractor had to hire another company to finish the work. The contractor then sued C & M, and C & M filed a third party complaint against NAPC and Home. C & M settled with the contractor. The Seventh Circuit held that, by paying NAPC's obligations under the contract, C & M had become subrogated to the contractor's claims against NAPC under the subcontract, *including the contractor's right to costs and attorney fees.* The court said:

> Upon payment by C & M of NAPC's obligations arising out of the subcontract, C & M became subrogated to [the contractor's] right to costs and reasonable attorneys' fees and entitled to assert such right against NAPC and Home ... The attorneys fees awarded C & M as part of its damages were incurred by C & M on account of the breach of the subcontract by NAPC and became the obligation of Home, upon the failure of NAPC to indemnify and save harmless C & M from such costs [as provided in the

> subcontract], as required by the equitable principles of subrogation under the circumstances here involved.

*Id.* at 748. The rationale behind allowing C & M to collect attorneys fees from Home is that, because C & M paid off the contractor and therefore became subrogated to its rights, subrogation allowed it to exercise the contractor's right to attorneys fees under the subcontract in an action on a performance bond securing the subcontract. This holding makes some sense if one views subrogation as a substitution of parties, so that when C & M "stepped into the place" of the contractor, it had all the rights the contractor had under the subcontract, which would include the right to seek attorneys fees.

This holding does appear to conflict with Indiana cases which view subrogation as a right of indemnity only. Those cases, by and large, do not involve an underlying agreement which provides for the right of collecting attorneys fees. Thus, the *Ruckman & Hansen* case can be reconciled with Indiana law by stating that the Indiana cases limit subrogation to indemnity *in the absence of an agreement under which a subrogee can claim more rights by virtue of its subrogation.* The one exception to this proposed reconciliation is the *Merchant's Bank* case, where the underlying debt was based on a note which allowed for the collection of attorneys fees. The court there found that an assignment of the note was ineffectual, and that the subrogee was entitled to indemnity only.

There is some question of whether the *Merchant's Bank* case was correctly decided. It relied on *Smith v. Wells*, 72 Ind. App. 29, 122 N.E. 334 (1919), for the proposition that subrogation is for indemnity only. *Smith* appears to involve a subrogation that had no agreement conferring further rights on the creditor (and hence the subrogee). Under the rule proposed above, the *Smith* holding is correct—subrogation without a further agreement guarantees indemnification only. But *Merchant's Bank* involved something more—a note which conferred additional rights. There-

fore, the reliance on *Smith* might have been inappropriate, especially in light of the sensible rationale of *Ruckman & Hansen.*

However, the court need not resolve this apparent conflict of authorities, because it is clear that the parties to this transaction intended that an assignment of PAC's rights under the Conditional Sales Agreement would take place. Such an assignment was clearly contemplated by L & S and Siegel in the Breach of Warranty Endorsement they obtained from Monarch, and the assignment executed by PAC indicates that the transaction was completed. Quite simply, this is a case where L & S contracted to allow an assignment under the second option of the subrogation clause. The court's holding merely reflects that fact by enforcing what L & S and Monarch had agreed to do—allow an assignment of PAC's rights against L & S to Monarch. The enforcement of Monarch's rights under the assignment is therefore merely enforcing the bargain L & S had struck.

Monarch is therefore entitled to an award of attorneys fees for its prosecution of this action against L & S and Siegel. Monarch will be ordered to submit a detailed request for an award of fees so that the amount of this award can be set.

Monarch is also entitled to the interest rate set in the Conditional Sales Agreement. In its brief in support of the motion for summary judgment, Monarch has argued that it is entitled to the 15% interest rate set out under the contract. Such an argument assumes that a default under the Conditional Sales Agreement accumulates interest at the rate set out for repayment of the loan itself. However, the clause which grants Monarch the right to obtain interest at a rate different from the statutory prejudgment interest rate states that L & S "must pay us interest from the date of notice until the date you make final payment *at the highest rate allowed by law*...." It would seem that the highest rate of interest allowed by law would be a rate which is just below the rate defined as

usury, but that is a function of the particular state's law· which would be applied. There is a question, however, as to which state's law would apply here. The Conditional Sales Agreement was presumably executed at Tasco Aviation's place of business, which appears to be in North Sioux City, South Dakota. Part of the performance of the contract could be said to have taken place in Indiana. The court will therefore leave the question of the appropriate interest rate, and thus the amount of interest due Monarch under the terms of the Conditional Sales Agreement, for a later decision after the parties have an opportunity to submit further briefs on this issue.

The court will therefore grant Monarch's motion for summary judgment against L & S and Siegel.

*Claims Against Ackerman*

■ Monarch's motion for summary judgment against Ackerman is based on PAC's right as a conditional vendor to sue Ackerman. Under *Universal Credit Co., Inc. v. Collier,* 108 Ind.App. 685, 31 N.E.2d 646 (1941), a conditional vendor has a cause of action against a third party tortfeasor who has wrongfully destroyed the subject matter of the sale once the conditional vendee is in default in its performance of the conditional sales contract. 31 N.E.2d at 648. Because PAC was the assignee of Tasco Aviation, and Monarch the assignee of PAC, Monarch seeks to enforce the rights of the conditional vendor, as the assignee of a conditional sales contract acquires all the remedies to which the conditional vendor was entitled. *Highland Realty, Inc. v. Indianapolis Morris Plan Commission,* 136 Ind.App. 208, 199 N.E.2d 110, 114 (1964).

Ackerman opposes the motion, claiming that there is a material issue of fact concerning a defense he believes can be raised against Monarch. Ackerman argues that Monarch can only have a cause of action against him through subrogation of a claim of L & S and Siegel. According to this argument, Monarch could not get an as-

signment of PAC's claims against Ackerman because the Breach of Warranty Endorsement states that Monarch, under the second option of the subrogation clause, could pay off the amount due PAC and then obtain an assignment of all of PAC's rights *against the insured or owner of the plane*—neither of which is Ackerman. Thus, Monarch's claim would have to come through L & S and Siegel, and Ackerman claims a defense concerning insurance coverage could prevent Monarch from recovering on such a claim.

The essential premise of Ackerman's argument is that Monarch cannot get a cause of action via assignment from PAC. Ackerman apparently believes that the subrogation clause of the Breach of Warranty Endorsement controls. It is true that the clause itself states that Monarch can get an assignment of PAC's rights against L & S and Siegel. It is also true that the assignment actually executed by PAC provides that PAC "assigns and transfers to MONARCH *all of its rights and interest in and to*" the Conditional Sales Agreement, as well as "PAC's right, title and interest as a secured party in and to the property described in" the Sales Agreement, which would therefore include any rights PAC might have as a conditional vendor under the Sales Agreement. Thus, PAC assigned more to Monarch than the Breach of Warranty Endorsement indicated would be assigned if Monarch were to pay off PAC under the subrogation clause. In order for Ackerman's argument to work, the Breach of Warranty Endorsement must be able to somehow limit or restrict the assignment PAC would give to Monarch.

The court concludes that Ackerman's argument must fail for several reasons.

First, PAC and Monarch had complete freedom to agree that PAC would transfer more than what was recognized in the Breach of Warranty Endorsement. PAC may have concluded that by assigning away its claims against L & S, Siegel, and Ackerman, it would get the benefit of immediate payment and avoidance of having to litigate against these parties to collect whatever PAC might have been able to get. That would certainly be sufficient consideration for the assignment of rights against Ackerman. Whatever the reason, the deal eventually struck between PAC and Monarch included an assignment of all rights, and thus the court must respect that agreement.[5]

Second, if the Breach of Warranty Endorsement offered any kind of limitation on the assignment Monarch could get, the limitation would not be Ackerman's to invoke. The subrogation clause provides that Monarch could pay off the amount due, and then get an assignment of PAC's rights against L & S. If PAC had some other right under the Conditional Sales Agreement which it considered valuable, it could have objected to a complete assignment of all rights, claiming that the Endorsement limits Monarch's right to an assignment. But such an "enforcement" of the subrogation clause is PAC's to make; if it feels generous, or is not concerned about enforcing other rights under the Sales Agreement, it can go beyond the limits of the subrogation clause. PAC would be the only party hurt by a failure to keep the assignment to an assignment of claims against L & S and Siegel; Ackerman would still be liable under the *Universal Credit* rationale to whomever the conditional vendor happened to be. Therefore,

5. At argument, Ackerman argued that the Breach of Warranty Endorsement acts only as an agreement by Monarch to waive asserting defenses against PAC that are being asserted against L & S and Siegel, and thus Monarch cannot be a subrogee of PAC. Transcript, March 27, 1986 Hearing at pp. 12–13. In a sense, a breach of warranty endorsement acts as a kind of waiver—Monarch agrees to pay PAC even if it determines that the policy does not cover a particular loss, thereby "waiving" Mon-

arch's right to assert a policy defense *against PAC*. But Ackerman's conclusion from this characterization—that Monarch cannot be a subrogee/assignee of PAC—does not follow. The Endorsement involved here contained the subrogation clause, which specifically allows for and contemplates subrogation or assignment of the Lienholder's (PAC) rights. Thus, the Endorsement makes Monarch a subrogee or assignee of PAC, depending on which option under the subrogation clause is exercised.

PAC is the party for whose benefit the limitation works, not Ackerman. If PAC did not want to exercise its right under the subrogation clause limitation, then that limitation should be irrelevant here.

Thus, the Breach of Warranty Endorsement, and the limitations on assignment in the subrogation clause therein, does not act to limit the assignment from PAC to Monarch. Because that assignment transfers all of PAC's rights under the Conditional Sales Agreement to Monarch, it transfers PAC's right as conditional vendor against a third party tortfeasor such as Ackerman. Further, because L & S and Ackerman went into default on the Conditional Sales Contract by failing to pay, PAC acquired a cause of action against Ackerman for negligent damage to the plane. That cause of action was transferred to Monarch by PAC's assignment, and thus Monarch has a cause of action against Ackerman that is independent of any claims L & S might have had against Ackerman. Any defenses Ackerman has against L & S are therefore irrelevant, and because no defense or issue of material fact has been raised against this motion, the court will grant Monarch's motion against Ackerman.

Judgment shall be awarded in the amount of the unpaid balance ($93,442.22), *see Universal Credit,* 31 N.E.2d at 648–49, plus prejudgment interest at the statutory rate of eight percent (8%).

### Conclusion

For the reasons stated above, plaintiff's motion for summary judgment against L & S and Siegel is hereby GRANTED. Plaintiff shall, within twenty (20) days of the date of this order, submit a request for attorneys fees, with appropriate documentation in support thereof. Plaintiff shall also submit within twenty (20) days a further brief on the issue of the applicable rate of interest to be charged on the $93,-442.22 amount due the plaintiff. Defendants shall have fifteen (15) days to respond to these submissions, and plantiff will have five (5) days in which to reply. The motion for summary judgment against defendant Ackerman is also hereby GRANTED. Plaintiff is hereby AWARDED JUDGMENT against defendant Ackerman in the amount of $93,442.22, plus prejudgment interest at the rate of eight percent (8%) per annum.